THE RIO GRANDE.

(*District Court, S. D. New York.* January 29, 1885.)

SALVAGE—VESSEL ON FIRE—AWARD.

A steamer coming up the Atlantic coast loaded with cotton, about 6 P. M., found her cargo in the lower hold on fire. Her hatches were battened down, and her passengers put on board a bark, and she headed for the Delaware breakwater, where she intended to submerge her hold in shallow water. She arrived there about 7:30 next morning; and, on signals, a wrecking tug and schooner at work there came to her assistance with a steam-pump, the captain designing to use it in an attempt to throw water directly into the compartment where the smothered fire was. Through want of sufficient length of hose, and of sufficient power in the engine, it was found impossible to throw any water directly into the compartment where the fire was, but only into the between-decks, where it ran aft. Upon finding that no water could be thrown directly into the compartment where it was wanted, the master ordered the two sea-cocks in the ship opened, for the purpose of flooding her, as originally designed, and that the ship, which had previously anchored in about 25 feet of water, be taken by the pilot into 19 feet of water, which was done by the libelant's tug. This was accomplished by about 10 A. M. From that time, the tug resumed the pumping, and continued it till about 6:30 P. M., when the ship was grounded on an even keel, and the fire extinguished, having put into the steamer's hold during that time about one-fourth of the water necessary to submerge the hold. During 36 hours following, the ship was pumped out by other means, and then came

to New York. On arrival, it was found that the fire had destroyed part of the cotton, and charred the under side of the deck, in that compartment. The steamer, with cargo and freight, were worth $315,300. *Held,* that the time saved in submerging the hold by the amount of water put in by the salvors' pump could not have exceeded two or three hours; that, owing to the insufficiency of their apparatus to throw water directly on the fire, considerable time was lost in the abortive attempt to do so; that, as it turned out, probably no great difference would have resulted from the absence of the salvors' services, since the other means employed by the ship would have extinguished the fire a little later; that, under these circumstances, $3,500 are a sufficient and liberal salvage compensation for the various incidental services rendered by the libelants.

Salvage.

The libel claims salvage compensation for services rendered to the Rio Grande, at the Delaware breakwater, in extinguishing a fire in her lower hold, among some bales of cotton, on the seventeenth of May, 1882. The libelants are engaged in the salvage and wrecking business, and have vessels consisting of schooners and steam-tugs, with steam-pumps and other appliances for those purposes. The Rio Grande is a steam-propeller of 2,566 tons, 313 feet long, 39 feet beam, with three decks. Her lower hold is divided into three compartments,—two forward of the engine-room, and one aft. She was bound from Galveston to New York, and had in her lower hold some 800 bales of cotton. At about 6 P. M., on May 16th, when about 90 miles below the Delaware breakwater, some smoke was discovered issuing from the middle compartment of the lower hold. Her passengers were shortly after transferred to an Italian bark, which was overhauled, and the steamer was then immediately headed for the Delaware breakwater, the design of the captain being to reach shallow water where he could submerge the hold of the vessel. Two of the libelant's vessels, a steam-tug and a schooner, had been employed just outside of the breakwater in raising a wrecked vessel. About 7 o'clock on the morning of May 17th, the Rio Grande was seen a little outside of the breakwater approaching and signaling for assistance. The steam-tug immediately went to her, and the captain of the steamer, on learning that a schooner with a steam-pump was near, desired her assistance to pour water into the compartment where the fire was. The steam-tug immediately went back and brought the schooner with the steam-pump along-side the Rio Grande, which had then come to anchor in about four fathoms of water. The steam-pump was placed upon the steamer's deck at about 8 o'clock; but the hose being insufficient to reach the hatch below, through which it was desired that the water should be poured, some time was consumed in making wooden troughs to conduct the water. When these preparations were completed, and the pump set to work, it was found that the lift of water from the sea to the height of the steamer's deck was too great for the power of the steam-pump. The pump was, therefore, put back upon the deck of the schooner, which was much lower. From this position the water could only be introduced into the ship through the forward port-hole. For want of sufficient leading hose, the water

could not be carried down the hatch into the hold where it was needed, but could only be pumped into the between-decks.

The steamer was loaded about 3 feet lower at the stern, drawing 14 feet there and 11 feet forward. During the night previous from the time when the fire was discovered, the pumps were kept busily at work, pumping in water; but on account of the smoke and heat, and the rubber hose being also melted in attempting to get water down the hatch, and it being desired also to keep the hatch closed, lest the fire should break out, the water had not been pumped directly into the middle compartment, where the fire was; and what was pumped in, as I infer, went mostly astern, increasing her depth aft. Thus, the water pumped in by the libelants' steam-pump, and thrown upon the lower deck, ran directly aft instead of going down into the compartment where the fire was. The only communication from the between decks to the hold below, the hatches being battened down, was through the coal-bunkers, which were a little aft of amid-ships, on each side, and some six or eight feet from the sides of the ship. These holes could not be reached by the water until enough had been pumped in to raise the level of the water behind sufficient to reach the coal-bunkers. The water running down these holes, into the engine-room beneath, would reach the compartment forward of it through the sluice-ways, from four to six inches square, one on each side, which were opened at the bottom of the compartment bulk-head. The captain, on finding that no water could be introduced by the libelant's steam-pump directly upon the fire, reverted to his original plan of submerging the hold. He therefore, at about 9 A. M., opened the two sea-cocks in the engine-room at the bottom of the ship, one of which was six inches in diameter and the other twelve inches, ordered the fires to be drawn, and directed the pilot to take the vessel into three and a quarter fathoms of water. The libelant's tug was used for this purpose, though the steamer still had 25 pounds of steam in her boilers, and she was moved by the tug about half a mile, when she was again anchored, in 19 feet of water. This was accomplished by 10 o'clock, and from that time until about 6 : 30 P. M. the libelant's steam-pump, with occasional interruptions, continued pumping water into the between-decks, as before stated. Small boats were plying back and forth between the steamer and the shore during the day, and numerous telegrams were forwarded.

The libelants endeavored to procure additional hose for service, but were unable to do so. The steamer grounded astern at about 2 P. M., but her stem was still drawing only 11 feet. The captain of the steamer, by telegraph, procured the assistance of the steam-tug North America from Philadelphia, which had a more powerful steam-pump and better appliances. She arrived at about 4 : 30 o'clock in the afternoon, and pumped through hose running through the other forward port-hole and down the forward hatch into the forward compartment of the hold, until about half-past 6, when, by these various means

combined, the steamer's head was finally brought down so that she was aground fore and aft, the lower hold flooded, and the fire extinguished. The libelants claim that the fire was completely under control from and after 2 o'clock in the afternoon; that their services were efficient, both in putting out the fire and in bringing the steamer to shallow water, and also in removing to the upper deck cargo of considerable value from the after part of the between-decks, where it was in danger of injury from water. The libelants' tug, on the following day, also brought the passengers back from the bark to which they had been previously transferred. The North America was employed, but not the libelants' boat, in pumping out the steamer; and at 1 o'clock of the night of the 19th the steamer was able to get under way for New York, which she reached in safety the following afternoon. The respondents, while admitting the facts in the main, as above stated, contend that the libelants' services were of a very unimportant character, contributing little or nothing towards the safety of the vessel.

*Benedict, Taft & Benedict,* for libelants.

*Butler, Stillman & Hubbard,* for claimants.

BROWN, J. The services rendered by the libelants in this case were clearly salvage services. But the case is destitute of any circumstances that give these services any highly meritorious character. There was no danger to the salvors; no hazard of life or property on their part; no call for the exercise of daring, skill, enterprise, or gallantry; no deviation by the salving vessel to enlarge the risks of her owners, as in *Markham* v. *Simpson,* 22 FED. REP. 743–745. The steamer, with a smothered fire in her lower hold, was, doubtless, in danger; but the mode of relief, whereby ship and cargo were saved from large loss, was devised and pursued by her own captain, interrupted only for the space of a couple of hours to enable the libelants' steam-pump to make the effort to pump water into the compartment where the fire was; an attempt that proved ineffectual through the libelants' lack of sufficient appliances and a sufficiently powerful steam-pump. The fire in this case manifestly was not extinguished chiefly or directly by means of the libelants' pump; and in this most essential particular this case differs materially from the cases of *The Suliote,* 5 FED. REP. 99, and *The Connemara,* 108 U. S. 352; S. C. 2 Sup. Ct. Rep. 754. The libelants' pumping merely aided in flooding the hold, thereby hastening in some degree the putting out of the fire; but the principal part of the water taken aboard was clearly taken through the steamer's own sea-cocks, which were about five times the capacity of the libelants' pump.

The evidence furnishes *data* for determining, with approximate correctness, the proportion of water introduced by the libelants' aid, taking their own estimate of the capacity of their pump, and consequently for determining, approximately, the utmost limit of time saved by their aid in extinguishing the fire. The capacity of the libelants'

steam-pump, as they say, was about 100 tons of water per hour; and, allowing for some interruptions, this would give from 600 to 800 tons of water pumped aboard by the libelants' tug. The whole amount of water taken aboard in flooding the ship is ascertained as follows: On arrival at the breakwater, she was drawing 11 feet forward and 15 feet aft, or an average of 13 feet. She finally grounded fore and aft in 19 feet; and when that was done the sea-cocks were closed. In thus sinking and grounding in 19 feet of water, the steamer displaced an additional weight of water equal to a body of water 6 feet in depth, with a surface equal to the length and breadth of the ship, viz., 313 feet by 39, that is to say, 73,242 cubic feet. Fresh water weighs $62\frac{1}{2}$ pounds to the cubic foot; sea-water, 64 pounds, or $31\frac{1}{4}$ cubic feet to the ton. This gives 2,344 tons additional water displaced in sinking the ship to 19 feet; and to accomplish this, evidently, precisely the same weight of water was necessary to be taken aboard. The quantity introduced by the libelants' pump was, therefore, from one-third to one-quarter of the whole amount taken aboard after the steamer's arrival at the breakwater; and the time saved in extinguishing the fire by the libelants' aid could not, therefore, exceed from two to three hours.

Another consideration, however, prevents the libelants' pump from being credited with the saving of time in extinguishing the fire in the full proportion of the amount of water pumped aboard by it. No water could be poured directly into the compartment where the fire was. The only avenues to it were two small sluice-ways from the engine-room and the run beneath the flooring of the lower hold running back from the forward compartment. The libelants' pump threw no water into the forward compartment; while the sea-cocks in the engine-room, which were aft of amid-ship, being of much larger capacity than the sluice-ways leading out of the engine-room, took in water much faster than it could run out through the sluice-ways into the middle compartment. All the water from the libelants' pump, as I have said, ran aft, so that the steamer's stern was aground in 19 feet of water by 2 o'clock, while her stem still drew but 11 feet. As the sea-cocks in the engine-room, however, took in the water considerably faster than it could run out into the compartment where the fire was, the only real effect of the additional water pumped in by the libelants' pump was, at first, to aid in sinking the stern, and later to increase somewhat the depth of water in the engine compartment, and thereby increase the pressure upon the water running through the sluice-ways.

Still another discount must be made from the time saved by the services of the libelants, in consequence of the interruption of the captain's original plan to submerge the ship, by the tug's undertaking to introduce the water directly into the compartment where the fire was. The libelants' testimony is unequivocally to the effect that when the steam-tug was first engaged by the captain, the steamer was coming in and had not yet anchored. She had previously taken a pilot

aboard, and the whole testimony leaves no doubt that, in first coming to anchor where he did, the captain hoped, through the libelants' aid, to extinguish the fire by pumping water directly into the compartment where it was, and to avoid the need of submerging the hold. The libelants' proposed aid was, I think, the reason of anchoring at first in water too deep for submerging the hold merely. The attempt proved ineffectual, in consequence, wholly, of the insufficiency of the libelants' pump and of its appliances; and from one to two hours were certainly lost in this abortive attempt. Had it not been for this undertaking by the libelants, there is no reason to suppose that the captain, instead of anchoring at first in deep water, would not at once have proceeded to the proper depth of water for submerging the hold, as he afterwards did proceed, in pursuance of his original plan. By this interruption not only was valuable time lost, but the assistance of the tug, in towing the steamer half a mile to her second place of anchorage, becomes, from this point of view, scarcely more than a just reparation to the steamer for the time lost in the attempt that those in charge of the tug ought to have known would be ineffectual, but which the captain of the steamer could not have known.

Salvage compensation is only allowed for benefits actually conferred; not for meritorious exertions alone. *The India,* 1 Wm. Rob. 408; *The Blackwall,* 10 Wall. 1, 12. All persons, however, who do render beneficial aid are entitled to a salvage reward. The ship and cargo in this case were saved; but not mainly, as the above considerations compel me to conclude, through the libelants' efforts. The fire was not raging; it had not burst out anywhere. Subsequent examination showed that it arose in the second tier of bales forward of the engine-room bulk-head, extending up through the bales to the under side of the deck, and charred the deck to a considerable extent in that vicinity. On the whole, I do not think it probable that there would have been any breaking out of the fire, even if the libelants' aid had not been rendered; and, as it turned out, probably no great difference would have resulted from the absence of their services, since the other means employed by the ship would have extinguished the fire a little later. While these circumstances are sufficient to prevent any large salvage reward, they are not sufficient to reduce it to a mere nominal sum, under the circumstances of this case as understood at the time. The ship and cargo were valuable; the steamer being worth $170,000, the cargo $130,000, and the freight and charges $8,300; in all, $315,300. So long as the fire was unextinguished, there was danger, even after the stern had grounded at 2 o'clock. The master, though a man of great coolness and self-possession, was under great apprehension for the safety of the ship, even after she had grounded astern. It was his duty to employ from the first every available means that could contribute anything towards hastening the extinguishment of the fire at the earliest possible moment. He called on the libelants for aid, and they rendered it promptly, and

their steam-pump was of some service in the early extinguishment of the fire; although, under the circumstances, I must hold it to be of a minor character. And their additional services in aiding in the removal of a part of the cargo and baggage; in furnishing a diver to shut the sea-cocks when the hold was full; in lying by during the night, at the master's request, to render any help that might become necessary; and in finally transferring the passengers back to the Rio Grande when she was prepared to start, are entitled to some consideration.

In the case of *The Connemara*, 108 U. S. 352, S. C. 2 Sup. Ct. Rep. 754, where $14,198, or 6 per cent., was allowed for the salvage of a ship and cargo worth $236,637, the court say that had not the fire "been promptly discovered and extinguished, there was imminent danger that it would extend to the rest of the cotton, and, fanned by the stiff breeze, destroy or greatly damage the ship and the whole cargo;" and the fire in that case was extinguished wholly by the libelants' services. The court intimate even there that "they would have been better satisfied with an award of a smaller proportion, though it was not so excessive as to violate any rule of law." In the case of *The Suliote*, also, (5 FED. REP. 99,) the fire was extinguished by the salvors, and not mainly through the ship herself.

On the whole, I think the sum of $3,500 will be a sufficient and liberal salvage reward in this case for the various incidental services of the libelants; sufficient for all the services actually rendered, and a reasonable encouragement for salvage undertakings and for the maintenance of proper means and appliances therefor, (*The Tornado*, 109 U. S. 110; S. C. 3 Sup. Ct. Rep. 78; *The Egypt*, 17 FED. REP. 369; *Baker Salvage Co.* v. *Excelsior*, 19 FED. REP. 436; *The Plymouth Rock*, 9 FED. REP. 422,) while not imposing upon the claimants, or on the vessel and cargo saved, a tax out of reasonable proportion to the benefits received.