**RAINBOW LINE, INC., Plaintiff,**

v.

**M/V TEQUILA (ex Linglee), her engines, tackle, boiler, equipment, etc., et al., Defendants.**

**No. 71 Civ. 2722.**

United States District Court,
S. D. New York.

April 18, 1972.

Cichanowicz & Callan, New York City, for plaintiff; Francis H. McNamara, New York City, of counsel.

Anthony J. Pirrotti, Brookyln, N. Y., for Murphy Pacific Marine Salvage Co.; Colum P. Nugent, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for Empire Commercial Corp.; William M. Kimball, Michael M. Cohen and John G. Ingram, New York City, of counsel.

Kenneth Heller, New York City, for defendants.

METZNER, District Judge:

Plaintiff Rainbow Line, Inc. [Rainbow] moves pursuant to Rule 56, Fed.R. Civ.P., for summary judgment on its claim arising out of an alleged breach of a charter party by defendant Simpson Steamship & Navigation Co. [Simpson]. Rainbow also moves for an order directing the clerk of the court to pay the United States Marshal the sum of $13,-891.75, this being the marshal's expenses and fees for arresting, keeping and selling the vessel M/V Tequila. Plaintiff Murphy Pacific Marine Salvage Co. [Murphy] has likewise moved for summary judgment on the basis of a claimed salvor's lien against the Tequila.

The various claims involved in these four consolidated lawsuits arise out of the checkered career of the M/V Tequila. Her adventures began on November 6, 1969, when she was chartered by Rainbow from her owner Simpson, a Bahamian corporation. At that time the Tequila bore the name M/V Linglee and was registered under the British flag. The charter contract was on the standard New York Produce Exchange form, and in paragraph 17 recited that any dispute between owner and charterer should be submitted to arbitration, that the decision of the arbitrators would be final, and that "for the purpose of enforcing any award, this agreement may be made a rule of the Court."

The Linglee was delivered to Rainbow on December 12, 1969. Sometime thereafter a dispute arose, and on October 28, 1970 the vessel was withdrawn by Simpson. Negotiations proved fruitless, and on January 4, 1971 Rainbow demanded arbitration pursuant to paragraph 17 of the contract, claiming $32,978.59 in damages. On May 13, 1971 the arbitration panel filed a decision awarding Rainbow

$17,849.42 on its claims. To date no payment has been made by Simpson on the award. Rainbow's complaint seeks to have judgment entered on this award, or in the alternative, if any party to the action contests the award, it seeks judgment for its original claim.

The claims of Murphy have their origin in another facet of the Linglee's history. In November of 1970, after the vessel was withdrawn from the charter party but before the commencement of arbitration, she ran aground off Cape Cameron, Honduras. Plaintiff Lewis Raymond Nadle unsuccessfully attempted to salvage the ship. Salvage assistance was then offered by Murphy, but the initial terms were unacceptable to Simpson's parent corporation, Windjammer International [Windjammer]. Negotiations continued, and on December 11, 1970 Murphy dispatched its salvage tug M/V Curb to aid the stricken vessel.

On December 14, 1970 Murphy and Windjammer reached agreement on the terms of compensation. Murphy was to be paid $3,600 per day from the time of dispatch of the Curb until her return, plus $5,000 per day for time spent at the site. In addition, Windjammer agreed to deposit with Murphy, as security for payment, 15,000 shares of Windjammer stock together with an assignment of the stock to Murphy. Murphy realized that the ship it was attempting to salvage was uninsured and that Windjammer apparently was in some financial difficulty.

On December 21, 1970 the vessel was refloated by the Curb. No payments, however, have been forthcoming by Windjammer under the salvage contract. Murphy claims that $61,632.08 is due and owing.

Meanwhile, another chapter in the hapless vessel's history was being written. On March 8, 1971, between the time the Linglee was refloated and the time arbitration began, she was sold by Simpson to another subsidiary of Windjammer, Tequila, Ltd., a Liberian corporation. The vessel's name was thereupon changed

to the M/V Tequila, and she was registered under the Liberian flag.

As part of this transaction, Tequila, Ltd. signed a promissory note for $180,000 in favor of Empire Commercial Corp. [Empire], which had advanced the money necessary for the purchase. The note was guaranteed by Windjammer. Empire also secured a first preferred mortgage on the vessel, which was duly recorded on March 8, 1971 in Liberia in accordance with Liberian law. On May 21, 1971 Empire sent Tequila, Ltd. notice of default and called the entire principal due. There remains $176,400 to be paid on the note.

The denouement was fast approaching for the good ship. In May of 1971 she was arrested in New York by a United States Marshal upon the complaint of Lewis Raymond Nadle, who claimed that $60,000 was due and owing for salvage and towage services furnished when the vessel ran aground off Honduras. In quick succession she was also arrested by Rainbow, Murphy and Empire. On June 22, 1971 she was sold at auction by the marshal for $162,000, the proceeds being paid into the registry of the court. Crew wages and subsistence in the amount of $24,939.20 have been paid out of the fund, leaving a balance of $137,060.80. The total claims against the vessel, amounting to $367,373.20, far exceed the monies available for payment. Thus the relative priorities of the various claims have crucial significance.

In its motion for summary judgment Rainbow argues that Simpson's breach of the charter party gave rise to a maritime lien on behalf of Rainbow. It contends that this lien, having arisen before the recording of Empire's first preferred mortgage, has priority over that mortgage. Rainbow further argues that Murphy waived its salvor's lien by taking the 15,000 shares of Windjammer stock as security under the salvage contract. If Rainbow's contentions are correct, it would be entitled to full and immediate payment because the fund is sufficient to cover all claims apart from those of Empire and Murphy.

For its part, Empire contends that Rainbow cannot collect on its arbitration award because that award has never been reduced to judgment. Empire further claims that breach of a charter party does not create a maritime lien, and that even if it does, the maritime lien would be inferior to a preferred mortgage. Empire also takes the position that Murphy waived its salvor's lien by accepting the Windjammer stock.

Murphy bases its motion for summary judgment on a claimed salvor's lien. If it had such a lien it would have priority over any lien that Rainbow had and, since it attached before the recording of the mortgage, over Empire's first preferred mortgage. Murphy argues that a salvor's lien is not waived merely by taking additional security, but that the intent of the parties is controlling, and that it never intended to waive its lien.

Turning now to the various claims, on the threshold is the question of whether Rainbow can rely upon its arbitration award to establish breach of the charter party and damages caused by that breach. Empire contends that Simpson, against whom the award runs, has not been served with process as required by 9 U.S.C. § 9, and that the court therefore lacks jurisdiction to enter judgment on the award.

Although there has been some confusion as to whether Simpson is a party to the present proceedings, it is now apparent that on May 5, 1971 Kenneth Heller filed a notice of appearance on behalf of all defendants, including both Simpson and the Tequila, and that on June 4, 1971 Heller submitted answering papers for all defendants. Simpson therefore is definitely a party and the present motion papers have been served in accordance with 9 U.S.C. § 9. Hence the court does have jurisdiction to enter judgment confirming the arbitration award. In addition, that judgment can be *in rem* against the vessel even though the arbitration award was *in personam* against Simpson. Marine Transit Corp. v. Dreyfus, 284 U.S. 263, 52 S.Ct. 166, 76 L.Ed. 282 (1932); Diana

Compania Maritima, S. A. of Panama v. Subfreights of the S.S. Admiralty Flyer, 280 F.Supp. 607, 615–616 (S.D.N.Y. 1968); 9 U.S.C. § 8.

No reason having been shown why the arbitration award should not be confirmed, the court enters judgment confirming the award in the amount of $17,-217.65, as claimed by Rainbow. 9 U.S.C. § 9.

Of course, the mere fact that the arbitration award has been confirmed does not entitle Rainbow to immediate payment on it. Resolution of this issue depends upon whether breach of a charter party gives rise to a maritime lien, and, if so, whether that lien has priority over the other claims asserted.

■ At the outset, these issues raise choice of law problems. Empire contends that it is flag law which determines whether a maritime lien is created by breach of a charter party. According to Empire's approach, British law would govern since the Linglee was of British registry at the time of breach. Under British law, breach of a charter party does not give rise to a maritime lien. 2 Carver, Carriage of Goods by Sea 1386 (12th ed. Colinvaux 1971); Scrutton on Charter Parties 434–35 & n. (i) (17th ed. McNair, Mocatta & Mustill 1964).

In support of its choice of law rule, Empire cites Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). That case, however, did not lay down a per se rule that flag law must govern in all situations. Rather, the Court evaluated the significant contacts and determined that under the facts presented in that case flag law would be controlling. Lauritzen v. Larsen was a tort action, and, as the Court pointed out, "the tendency of the law is to apply in contract matters the law which the parties intended to apply." 345 U.S. at 588–589, 73 S.Ct. at 931. This is certainly the rule which should be followed in interpreting the substantive provisions of contracts.

And in the present case it is clear that the parties intended their rights and ob-ligations under the charter party to be governed by the law of the United States. The charter party was the standard New York Produce Exchange contract. It was executed in Miami, required payment in United States currency, and provided for arbitration in New York. In addition, it contained a "U.S.A. Clause Paramount," making it subject to and expressly incorporating the maritime law of this country, and additional paragraphs expressly incorporating the Harter Act (46 U.S.C. § 190 et seq.) and the United States Carriage of Goods by Sea Act (46 U.S.C. § 1300 et seq.).

■■ Thus, the court will look to the law of the United States to determine whether breach of the charter party by Simpson created a maritime lien in favor of Rainbow. Under the law of the United States, such a lien arises in either direction upon breach of a charter party by either party. The charterer has a lien on the vessel upon breach by the owner; the owner has a lien on cargo and subfreights upon breach by the charterer. Schilling v. A/S D/S Dannebrog, 320 F.2d 628, 632 (2d Cir. 1963); The Oceano, 148 F. 131 (S.D.N.Y.1906); Gilmore and Black, The Law of Admiralty 517 (1957).

Empire urges that even under domestic law the breach of a charter party does not create a maritime lien, despite the language in the above-cited cases. To support its position, Empire argues that only the contract liens specifically referred to in 46 U.S.C. §§ 953(a) and 971 are maritime liens. § 953 deals with the question of priority of liens. § 953 (a) defines what is a "preferred maritime lien" and has two subdivisions. The first grants preferred status to any lien arising prior in time to the recording of a preferred mortgage. The second subdivision grants preferred status, without regard to when they arose, to specified liens such as those arising out of tort, for failure to pay wages of the crew or stevedore, for the general average and for salvage. Neither subdivision creates or defines a lien.

§ 971 does create maritime liens, but merely for furnishing necessaries such as repairs or supplies to a vessel.

Neither section makes mention of liens for cargo damage, unpaid freight, and bottomry and respondentia bonds, which are classic and universally recognized maritime liens. Gilmore and Black, *supra* at 514–18; The John G. Stevens, 170 U.S. 113, 18 S.Ct. 544, 42 L.Ed. 969 (1898). To assume, as Empire does, that these sections are the sole repository of contract liens is to disregard the long and volatile history of maritime jurisprudence concerning the scope and coverage of the Lien Act and the effect of claims not mentioned in the Act. See Gilmore and Black, *supra* at 539–68.

■ Rainbow's claim against the vessel, being a maritime lien, is retained even though the ship subsequently be sold or mortgaged. Gilmore and Black, *supra* at 482. It may be enforced as against all other claims over which it has priority.

Now as to the issue of relative priorities, again we must look to the law of the United States. Rainbow's lien arose under the law of this country, as did whatever lien Murphy might have. In addition, Empire secured its first preferred mortgage pursuant to a promissory note executed in the United States, to be performed here, and expressly incorporating United States law as the governing law. It was here that the vessel was arrested and here that she was sold. It is in a court of the United States that the fund at issue presently reposes and in which the various claims must be adjudicated.

■■ The relative priority of Empire's mortgage will be considered first. It is clear that, having been duly recorded in accordance with the laws of Liberia, it is a "preferred mortgage" within the meaning of 46 U.S.C. § 951. Upon sale of a mortgaged vessel, a preferred mortgage lien has priority over all claims against the vessel except preferred maritime liens and fees taxed by the court.

§ 953(b). Empire contends that under this provision its preferred mortgage has priority over Rainbow's claim, even if the latter is considered a maritime lien.

Here again Empire argues that since breach of a charter party is not specifically mentioned in § 953(a), dealing with preferred status, a claim for such a breach is not entitled to priority. This attempt to restrict § 953 has already been disposed of. § 953(a)(1) encompasses *all* liens, and the only question is determining the time of the breach. There is no dispute that the charter party was breached by Simpson in October of 1970 and that Empire's mortgage was not recorded until March of 1971. Therefore, pursuant to § 953(b), Rainbow's lien has priority over Empire's preferred mortgage.

■ This leaves for consideration the priority to be accorded Murphy's claim. Murphy asserts that it has a salvor's lien, one of the most highly regarded liens in maritime law. Regardless of when it accrues, such a lien is given priority over all other maritime liens except those for wages. Gilmore and Black, *supra* at 593, 597; 46 U.S.C. § 953.

Both Rainbow and Empire, however, contend that Murphy waived its salvor's lien by taking the 15,000 shares of Windjammer stock as security under the salvage contract. For this proposition they rely upon W. A. Marshall & Co. v. S.S. "President Arthur", 279 U.S. 564, 49 S.Ct. 22, 73 L.Ed. 522 (1929). In that case a supplier of coal was held to have waived its lien by taking the vessel owner's trade acceptances as additional security for payment under the supply contract. The Court stated that the supplier had looked to the personal responsibility of the owner rather than to the vessel and therefore could not assert the lien which it would have had in the absence of the special arrangements.

■ However, the *President Arthur* does not lay down the per se rule which Empire and Rainbow urge upon the court.

Subsequent cases make clear that waiver will be found only where there is a strong showing that the party attempting to assert the lien intended to look elsewhere than the vessel for payment of its claims. Crustacean Transportation Corp. v. Atalanta Trading Corp., 369 F.2d 656 (5th Cir. 1966), and Luckenbach Overseas Corp. v. S.S. Audrey J. Luckenbach, 232 F.Supp. 572 (S.D.N.Y.1963) [no waiver in subsequent assignment of freights]; Barnes v. The "Kongo", 174 F.2d 67 (6th Cir. 1949), and United States v. The Pomare, 92 F.Supp. 185 (D. Hawaii 1950) [waiver due to reliance on reimbursement from freight charges]; The Stjerneborg, 106 F.2d 896 (9th Cir. 1939), aff'd, 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197 (1940) [express reservation of lien prevents waiver]; The City of Seattle, 61 F.2d 763 (2d Cir. 1932) [reliance on third party's personal note results in waiver]; Gilmore and Black, *supra* at 640.

Murphy's intent in accepting the Windjammer stock is an issue of fact which must be resolved after trial rather than on the affidavits submitted on these motions. Since a salvor's lien arises only if salvage is successful, Murphy did not have a lien when it took the stock.

Because determination of the existence of Murphy's salvor's lien must await trial, no finding can be made at this time as to the priority of Murphy's claim. If Murphy does have a salvor's lien, it has priority over both Rainbow's claim and Empire's. If Murphy does not have a salvor's lien, it has priority over neither of the other two claims. *A fortiori,* neither Rainbow nor Murphy is entitled to payment until this issue has been litigated.

Finally, there appears to be no opposition to Rainbow's motion for an order directing the clerk of the court to pay the United States Marshal the sum of $13,891.75. Claims by the marshal have priority over all other claims, Gilmore and Black, *supra* at 596, and an itemized invoice has been submitted detailing the marshal's costs and expenses. The court directs the clerk to pay the full amount of this bill, a total of $13,891.75.

The motions of Rainbow and Murphy are disposed of in accordance with the above opinion.

So ordered.