**Lewis Raymond NADLE, Plaintiff-Claimant,**

v.

**M/V TEQUILA, Defendant,**

**Empire Commercial Corporation, Claimant.**

**No. 71 Civ 2069.**

United States District Court, S. D. New York.

June 12, 1974.

Healy & Baillie, New York City, for plaintiff-claimant, Nadle; Bruce A. McAllister, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for Empire Commercial Corp., Michael Marks Cohen and John G. Ingram, New York City, of counsel.

GURFEIN, District Judge:

This is a claim by a salvor, Lewis Raymond Nadle, for a maritime lien on account of his salvage operations in attempting to free from a strand in Honduras the vessel M/V TEQUILA (ex LINGLEE).[1] The claim is opposed by the holder of the foreign preferred ship mortgage, Empire Commercial Corporation ("Empire"), which obtained the mortgage four months after the alleged salvage by the claimant. It is agreed that if Nadle has a maritime lien it is superior to the valid maritime lien based on the mortgage. 46 U.S.C. § 953(a); 46 U.S.C. § 951. The question at issue is whether the claimant has a maritime lien and, if so, for how much.

The TEQUILA was arrested at the instance of the claimant and sold. All claims, except this one, have been settled or decided. There remains in the registry of the Court about $70,000. Rainbow Line v. M/V TEQUILA, 480 F.2d 1024 (2 Cir. 1973), aff'g, 341 F.Supp. 459 (S.D.N.Y.1972); Nadle v. M/V TEQUILA, 1973 A.M.C. 909 (S.D.N.Y. 1973).

Nadle, an American resident of Guatemala, claims approximately $60,000. Empire has a judgment in foreclosure in the amount of $230,814.47.

The TEQUILA was known as the LINGLEE at the time she stranded in November, 1970 off the coast of Honduras. Nadle was the owner of a remodeled minesweeper called the AQUARIUS. The LINGLEE was a British-flag vessel owned by Simpson Steamship and Navigation Co. ("Simpson").

At the trial, Nadle testified by deposition.[2] The log of the LINGLEE was available, as was a smooth salvage log by Nadle.

On November 9, 1970, the LINGLEE stranded at Cape Cameron, Honduras.[3] Two days later, a 500 horsepower tug named LAFITTE TIDE arrived to help but was unable to free the LINGLEE.[4] By telegram on November 15, 1970, Simpson hired the AQUARIUS "at the rate of $1,000 per day" to salvage the LINGLEE.[5] There was no explicit statement of whether it was a "no cure, no pay" contract, and a salvage award is, accordingly, not barred. See 1 Benedict, Admiralty § 124 (6th ed. 1940); The Camanche, 8 Wall. 448, 75 U.S. 448, 19 L.Ed. 397 (1869); Lago Oil & Transport Co. v. United States, 218 F.2d 631, 634 (2 Cir. 1955) (Frankfurter, J.).

Nadle dispatched the AQUARIUS on November 16 and she arrived at the strand after nightfall on November 17.[6]

---

1. Nadle's motion pursuant to Fed.R.Civ.P. 25(c) for an order substituting Lewis M. Schott, was granted on December 6, 1972.

2. The deposition is received except for portions marked in Empire's memorandum as A (pp. 9–10); G (pp. 27, 28); H (p. 29); J (p. 56); Q (pp. 117–118); S (top of p. 151); T (pp. 151–153). These are excluded on the objections of Empire.

3. Ex. D, p. 20.

4. Ex. 1, p. 20; Ex. D, pp. 22–26.

5. Ex. 1, pp. 8–17; Ex. 2.

6. Ex. 1, pp. 6–8, 17–18; Ex. D, p. 28.

The LAFITTE TIDE which had left the scene on November 15,[7] returned on November 18.[8] She acted jointly with the AQUARIUS on November 18 in getting a line over to the LINGLEE, and they started pulling the next day.[9] For the following four days both vessels pulled while the LINGLEE heaved on her port anchor, but without success.[10] On November 23 the LAFITTE TIDE left the scene, and the AQUARIUS continued pulling alone.[11] By noon on November 24, as noted in the LINGLEE's log, there was still "no significant progress." [12]

Nadle, himself, arrived at the scene on November 24.[13] That night the weather got worse and the AQUARIUS lost her anchor and chain.[14] She cut the tow rope which she was forced to do because she could not remain where she was.[15] Nadle stayed on the LINGLEE.

The story of the attempts by the AQUARIUS to get the LINGLEE off the strand could be told in great detail, but that is not necessary to the decision. The attempts were not successful.

The log of the LINGLEE in evidence tells the sad tale in the language of Judge Hough, "ARAGON [AQUARIUS] did all she could, and did it well, until she broke down." Lincoln S. S. Line, Inc. v. United States, 7 F.2d 886 (2 Cir. 1925). In fact, I cannot find that AQUARIUS did as well as ARAGON is said to have done, since ARAGON "had an exceptionally well-arranged towing apparatus" which I find AQUARIUS did not.

Be that as it may, I cannot fault the AQUARIUS for effort, since she showed tenacity in her efforts to rescue the LINGLEE. The seas were heavy. She had to cut loose on November 25 after losing her own anchor and chain. She also had to cut loose her whaleboat. She returned on November 27, but had to slip the tow wire after an unsuccessful maneuver.[16] On December 2, the insurance wire on the towing cable parted.[17] On December 5 the whaleboat was smashed again.[18] On December 11 she caught the floating hawser in her port propeller.[19] On December 12 the AQUARIUS was discharged.[20]

On December 15 a salvage vessel named the CURB took over under a salvage contract. On the sixth day of endeavor, on December 21, the CURB succeeded in pulling LINGLEE off the strand "fully afloat with power and steerageway." [21] An arbitrator awarded the CURB the sum of $61,632.08 as a salvage award based upon the contract terms. The maritime lien was settled in this action for $30,916.04 which has been paid to the owner of the CURB.

Captain Halboth, an expert called by Empire, testified that in his opinion, the AQUARIUS, a wooden hulled 1,000 horsepower minesweeper, had neither the horsepower nor the bollard pull required to lift the LINGLEE off the strand, and that she did not have the necessary beach gear and accessory equipment, including special stern bitts for towing needed to do the job.[22] He also criticized the lack of salvage plan of Nadle,[23] but I find that, in essence, Nadle did not rely merely on towing, which would have been obviously inadequate, but also on concurrent laying out of anchors and cables, including the heaving

7. Ex. D, p. 26.

8. Ex. D, p. 29.

9. Ex. D, pp. 29–30.

10. Ex. D, pp. 30–34.

11. Ex. D, p. 34.

12. Ex. D, p. 35.

13. Ex. 1, p. 31.

14. Ex. 1, p. 33.

15. Ex. 1, pp. 33–35, 42, 43; Ex. D, p. 35.

16. Ex. 1, pp. 50–53; Ex. D, p. 38.

17. Ex. D, p. 43.

18. Ex. 1, p. 82.

19. Ex. D, pp. 52–53; Ex. 1, p. 86.

20. Ex. 1, p. 86.

21. Ex. E, p. 3.

22. Halboth, Tr. pp. 32–34.

23. Halboth, Tr. pp. 35–36.

of a bow anchor seaward to influence the bow to a seaward position perpendicular to the shore. The use of this technique in the circumstances is well-known. See Knight's Modern Seamanship, 15th ed., p. 272 (1972).

Nadle explains his failure in simple and bitter terms. He spent almost a month trying to pull the LINGLEE off the strand and he believes he would have succeeded if the Master of the LINGLEE had cooperated in a coordinated way. For example, on November 25 Nadle contends he got the bow of the LINGLEE seaward, but that before she could be pulled off the strand, the Master heaved his port anchor causing it to come out of the bottom and drag. This is said to have happened again on November 27.

Captain Halboth was of the opinion that the AQUARIUS was a most unlikely vessel for getting the LINGLEE off the beach, in any event, because that could be done only in rough weather with large waves breaking, and the AQUARIUS was simply not built to hold a tow line taut in stormy weather without harm to herself.[24]

■ I find that there is no preponderance of the evidence that the AQUARIUS ever actually got the LINGLEE sufficiently out of the sand so that she could float free, or that the efforts of Nadle made it easier for CURB to free her. I also find that there is no preponderance of the evidence to establish that the LINGLEE would have become more deeply grounded on shore, if it had not been for the salvage attempts of Nadle.

With these observations in mind, we turn to the law of salvage.

■ Nadle was not a volunteer salvor but a contract salvor, hired to do the job. Since his was not a contract to pay a fixed sum, whether successful or not, he may claim a salvage award and a consequent maritime lien. The Camanche, supra; see Lago Oil & Transport Co. v. United States, supra. The rule in salvage, however, has always been that only success is rewarded. The Blackwall, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870 (1869); The Sabine, 101 U.S. 384, 25 L.Ed. 982 (1879). If the vessel is not saved, there can be no salvage award. "It is not what salvors offer or attempt to do that entitles them to compensation, but what they succeed in doing to the benefit of the property." Curry v. The Loch Goil, Fed.Cas.No.3,495 (D.C.Fla.1877); The Rio Grande, 22 Fed. 914 (S.D.N.Y.1885).

"It is not required however that the property be saved solely by the efforts of the person seeking the award or that his efforts resulted in complete success. It is sufficient if his efforts contributed in some way to the ultimate success." Norris, The Law of Salvage § 91 (1958). See The Annie Lord, 251 Fed. 157 (D.C.Mass.1917); The I. W. Nicholas, 147 Fed. 793 (W.D.N.Y.1906). The contribution to the ultimate rescue must be established by a preponderance of the evidence. Lincoln S. S. Line, Inc. v. United States, supra.

■■ Incidental salvage services are compensable, however. The Rio Grande, supra. Securing aid and supplies for a distressed ship, and standing by to provide whatever assistance the vessel may require is a salvage service. Norris, supra at §§ 75–76; see Conolly v. S. S. Karina II, 302 F.Supp. 675, 680 (E.D.N.Y. 1969).

■ In salvage the reward hinges on the success. The Blackwall, supra, 77 U.S. at 12. Failure is not excused by adverse action of the elements nor, apparently, by the ineptitude of the ship's master. At least no authority has been cited to support such a proposition. I must conclude that in salvage "almost" is not "enough."

■ The AQUARIUS is entitled to some award for bringing food and supplies to the LINGLEE during her month-long siege on the strand. She was aground on an isolated shore. Hun-

24. Halboth, Tr. pp. 51–54.

gry, her crew might have abandoned her and although there is inadequate proof that she would have foundered if abandoned, the presence of her crew and their aid made rescue by the CURB possible. Rescue at sea should be 'encouraged. Nadle went to great pains to bring the food and supplies. He succeeded in getting them to the stricken ship.

I conclude that Nadle is entitled to an award of $5,000 plus reimbursement of the $700 he expended for the food and supplies. I have taken interest into account, and the award is without interest except from the time of judgment.

Submit order on five days' notice.