**NEW ENGLAND FISH COMPANY, a corporation, and Seattle Seafoods, Inc., a corporation, Plaintiffs,**

**v.**

**The BARGE OR VESSEL SONYA, Official No. 504320, her engines, tackle, furniture, equipment, etc., and Marine View Fisheries, Inc., a corporation, Defendants,**

**v.**

**KODIAK OIL SALES, INC., a corporation, et al., Plaintiff Intervenors.**

**No. A–17–68 Civ.**

United States District Court,
D. Alaska.

Sept. 2, 1971.

---

W. C. Arnold, Anchorage, Alaska, for plaintiffs.

G. Kent Edwards, U. S. Atty., A. Lee Petersen, Asst. U. S. Atty., Anchorage, Alaska, John F. Meadows, Atty., in Charge, West Coast Admiralty & Shipping Section, San Francisco, Cal., and Paul G. Sterling, Admiralty & Shipping Section, U. S. Dept. of Justice, for intervenor United States.

Warren W. Matthews, Jr., of Burr, Pease & Kurtz, Anchorage, Alaska, for Nakat Packing Corp.

Roy H. Madsen, Kodiak, Alaska, for Kodiak Oil Sales, Inc. and Kodiak Island Borough.

J. H. Shortell, Anchorage, Alaska, for Marine View Fisheries.

## MEMORANDUM OF DECISION AND ORDER

PLUMMER, Chief Judge.

The Barge or Vessel Sonya was arrested by the U. S. Marshal on February 7, 1968, following institution of proceedings by New England Fish Company and Seattle Seafoods, Inc., to foreclose a preferred ship mortgage. The United States intervened as assignee of the first preferred mortgage, Kodiak Island Borough intervened alleging a lien for unpaid property taxes, and Kodiak Oil Sales, Inc. and Nakat Packing Corporation intervened claiming a lien for fuel furnished to the vessel for use in processing sea food products. The informal claims of Donald V. Anderson, L. B. Liedorff, L. A. Mork, Charles Peatrikoff, Tom Shugak and Sally Ann Maffay (hereinafter referred to as claimants) to a maritime lien for unpaid wages were lodged with the court by attorney for plaintiffs.

Pursuant to this court's order of August 1, 1968, the vessel was advertized and sold by the Marshal on August 16, 1968.

On March 18, 1969, an order was entered establishing the rank and validity of claims pursuant to 46 U.S.C.A. § 953 (1958).[1] The order made the following

---

1. (a) When used hereinafter in this chapter, the term "preferred maritime lien" means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this chapter; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, for wages of the crew of the vessel, for general average, and for salvage, including contract salvage.

(b) Upon the sale of any mortgaged vessel by order of a district court of the United States in any suit in rem in admiralty for the enforcement of a preferred mortgage lien thereon, all preexisting claims in the vessel, including any possessory common-law lien of which a lienor is deprived under the provisions of section 952 of this title, shall be held terminated and shall thereafter attach, in like amount and in accordance with their respective priorities, to the proceeds of the sale; except that the preferred mortgage lien shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed, by the court.

notation with regard to alleged wage claims:

"*Seamen's Wage Claims—Second Priority*

Donald B. Anderson, L. B. Liedorff, L. A. Mork, Charles Peatrikoff, Tom Shugak, Sally Ann Maffay were aboard the Sonya when she was arrested by the marshal as crew members thereof and alleged to the marshal that they had unpaid wage claims for the period of January 31, to February 6, the date of the vessel seizure in the amount of $3397.00. The marshal reported these claims to counsel for plaintiff and to the court. No small (sic) [wage] claims were filed and the claimants were treated as wards of the admiralty until memorandums were filed in response to the order of October 9, 1968, for hearing on rank and validity of the claims held October 24, 1968, at which time the United States on behalf of the Small Business Administration objected to the allowance of said claims on the ground that they did not constitute 'wages of the crew of the vessel's because the vessel was not in navigation. The wage claimants have not been afforded an opportunity to make formal proof of their claims or answer objections of the United States and the sum of $3397.00 is to be held in the registry of the court pending final determination of these claims and counsel for plaintiff is directed to contact claimants if possible and advise them to appear and support their claims. If they do not do so within a reasonable time, counsel for plaintiffs shall initiate and conclude any proceedings which are necessary to disburse all the remnants that are left in the registry. The court maintains jurisdiction for this purpose but the case shall otherwise pass to final decree.

To be held in the Registry $3,397.00"

On April 7, 1969, findings of fact and conclusions of law governing this case were entered. In addition to summarizing the previous orders of the court, the following relevant findings and conclusions were entered:

"FINDINGS OF FACT

\*    \*    \*    \*    \*    \*

2. The vessel was afloat and anchored at Old Harbor. She rose and fell with the tide and access to the beach was had by a narrow pier. She was equipped to freeze crab and other species of fish and store and hold same under refrigeration and although not receiving fish at the time of the arrest, she had bait and other perishables aboard and was supplying electrical energy to the native inhabitants of the village of Old Harbor pursuant to an agreement made with the village by her owner whereby she would supply electrical energy in return for moorage privileges and fresh water which was piped to her across the pier above mentioned.

3. The vessel's main engines were intact but her propeller had been removed pursuant to a restriction imposed upon her by the Maritime Administration who had sold her as a surplus vessel pursuant to applicable statute. She was therefore without means of propulsion.

\*    \*    \*    \*    \*    \*

CONCLUSIONS OF LAW

\*    \*    \*    \*    \*    \*

1. The Sonya is a vessel of the United States and this action in rem and in personam for the foreclosure of preferred ship mortgages, and other maritime liens is within the admiralty and maritime jurisdiction.

\*    \*    \*    \*    \*    \*

4. Decree should issue  \*  \*  \* with jurisdiction retained for the purposes of (1) determination of the validity of the claims of certain seamen in the sum of $3,397.00.  \*  \*  \*"

On April 28, 1971, attorney for plaintiffs moved the court for an order directing that funds currently held in court be disbursed to the individuals claiming a maritime lien for unpaid

wages. The United States has opposed the motion on the ground that the Sonya was out of navigation during the time that the claimants allegedly contributed services and could not have a crew within the meaning of 46 U.S.C.A. § 953(a) (2) (1958) or be subjected to maritime liens of any kind.

## I. *Was the Sonya subject to maritime liens?*

The United States has consistently maintained that the Sonya was out of navigation and not subject to any maritime liens, except, of course, the preferred ship mortgage, which was presumably executed prior to the voyage from Seattle to Old Harbor when the vessel was still "in navigation"—i. e. before it came to its more or less permanent berth. (The subsequent removal of the vessel from navigation would not deprive the admiralty court of jurisdiction to foreclose the preferred ship mortgage, although it would, under the United States' theory, bar subsequent maritime liens.)

The findings of fact and conclusions of law entered in this case on April 7, 1969, establish that the Sonya was within admiralty jurisdiction for purposes of incurring maritime liens. The only issue raised by this motion is whether the claims presented on behalf of the claimants constitute maritime liens within the meaning of 46 U.S.C.A. § 953 (1958).

## II. *Are the claims for "wages of the crew of the vessel"?*

46 U.S.C.A. § 953(a) provides:

"(a) When used hereinafter in this chapter, the term 'preferred maritime lien' means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this chapter; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, *for wages of the crew of the vessel,* for general average, and for salvage, including contract salvage." (Emphasis added.)

Section 953(b) makes preferred liens superior to preferred ship's mortgages.

1 Norris, The Law of Seamen, § 447 (1962) states the test for determining whether one is a seaman entitled to a wage lien against the vessel:

"(a) Is the vessel in navigation, (b) are the services rendered maritime in character, and (c) is he aboard primarily to aid in navigation."

On "who are seamen" generally see 1 Norris, The Law of Seamen, §§ 1–19 (1962).

The leading case construing the phrase "crew of the vessel" under § 953 is The Herdis, 22 F.2d 304 (D.Md.1927). The court defined "crew" as "seamen performing maritime services on a vessel in navigation" 22 F.2d at 306. The court went on to hold that watchmen on board vessels idle by reason of a decline in shipping, but which were afloat and moored in navigable areas of Baltimore Harbor were crew members because the ship was still "in navigation" and the men performed duties that only a competent seaman could perform, such as tending pumps and winches and insuring that the vessels did not become a hazard to navigation. The court noted:

"The nature of the services performed in every case must be closely examined. Thus, where the services are such as only a seaman could perform, they have been held maritime, as, for example, moving of a vessel with the rise and fall of the tide; attending to proper anchorage, pumping, and drying sails. But, if the services are such as not to require the efforts of a mariner, the result is otherwise. For example, services of watchmen on vessel laid up at her wharf, or launched, but still under construction, or laid up for repairs, or for the winter." (Citations omitted.)

With the possible exception of manning the Sonya's bilge pumps, the duties of the claimants related entirely to the maintenance and operation of the ship's refrigeration plant and electrical generation equipment. The skills required

were not those of a mariner, nor did they have the remotest connection with the navigation of the ship.

Although there are few cases construing the phrase "crew of the vessel" under § 953, the term "seaman," which is virtually synonymous with "crew member,"[2] has been frequently examined by courts considering the Jones Act, 46 U.S.C.A. § 688 (1958), and its relationship to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq. (1970).[3]

The test of seaman status under that statute is (1) whether the vessel was in navigation, (2) whether there was a more or less permanent connection with the vessel, and (3) whether the employee was aboard primarily to aid in navigation. Nelson v. Greene Line Steamers, Inc., 255 F.2d 31, 33 (6th Cir. 1958), cert. den. 358 U.S. 867, 79 S.Ct. 100, 3 L.Ed.2d 100 (1958).

The "aiding in navigation" criterion has been relaxed by some courts to include any person "contribut[ing] to the [primary] function of the vessel or to the accomplishment of its mission." Offshore Co. v. Robison, 266 F.2d 769 (5th Cir. 1959); Lawrence v. Norfolk Dredging Co., 319 F.2d 805 (4th Cir. 1963), cert. den. 375 U.S. 952, 84 S.Ct. 443, 11 L.Ed.2d 313 (1963). If this construction were followed the claimants would not be foreclosed by reason of the "aiding in navigation" requirement.

The requirement that the vessel be "in navigation" is, however, fatal to the claimants' cause. Norris states that "A person who works aboard a vessel cannot be a 'seaman' if the vessel is not in navigation." The author continues:

"The term 'in navigation' should not be read narrowly or literally as if the vessel at sea is navigating in an operational sense. 'In navigation' means that the vessel is engaged as an instrument of commerce and transportation on navigable waters. Therefore, a vessel is in navigation although moored to a pier; in a repair yard for periodic or voyage repairs, or is temporarily attached to some object.

"Section 713 of Title 46 U.S.C. which defines a 'seaman' likewise defines a 'vessel' and treats it as 'every description of vessel navigating on any sea or channel, lake or river, etc.' [4]

2. To the extent that there is any discrepancy, the term "seaman" probably is more inclusive. *Cf.* Gahagan Const. Corp. v. Armao, 165 F.2d 301 (1st Cir. 1948), cert. den. 333 U.S. 876, 68 S.Ct. 905, 92 L.Ed. 1152 (1948); Rackus v. Moore McCormack Line, Inc., 85 F.Supp. 185 (E.D. Pa.1949).

3. *See* Annotation, When is Vessel in Navigation for Purposes of Jones Act, 5 A.L.R.Fed. 674:
"In 1926, the Supreme Court held that a stevedore was a 'seaman' under the Jones Act, [International Stevedoring Co. v. Haverty, 272 U.S. 50 [47 S.Ct. 19, 71 L.Ed. 157] (1926)], and shortly thereafter Congress enacted the Longshoremen's and Harbor Workers' Compensation Act of 1927, 33 U.S.C. §§ 901 et seq., which gave a remedy against employers by way of compensation for disability or death suffered on navigable waters by any employee not a 'master or member of a crew of any vessel.' This Act makes the prescribed liability to employees within the coverage of the Act exclusive, and the effect of these provisions of such Act is to confine the benefits of the Jones Act to the members of the crew of a vessel plying in navigable waters. [Citing Swanson v. Marra Bros., Inc., 328 U.S. 1 [66 S.Ct. 869, 90 L.Ed. 1045], (1946); Senko v. LaCrosse Dredging Corp., 352 U.S. 370 [77 S.Ct. 415, 1 L.Ed.2d 404], (1957), reh. den. 353 U.S. 931 [77 S.Ct. 716, 1 L.Ed.2d 724]; Bodden v. Coordinated Caribbean Transport, Inc., 369 F.2d 273 (5th Cir. 1966).] It has been stated that the Jones Act concept of 'seamen' since the passage of the Longshoremen's and Harbor Workers' Compensation Act has been narrowed to the point where it includes only one who is 'a member of the crew' of a vessel plying in navigable waters. McKie v. Diamond Marine Co., 204 F.2d 132 (5th Cir. 1953)."

4. "Vessel" is also defined in 1 U.S.C.A. § 3:
"The word 'vessel' includes every description of watercraft or other artificial contrivance used, *or capable of being*

"What then is meant by a 'vessel navigating'? In Gonzales v. U. S. Shipping Board Emer. Fleet Corp., 3 F.2d 168 (E.D.N.Y.1924), it was held that a ship is not in navigation if there is no present hope or intention of having her go to sea and if it would take a long time to put her in shape for an ocean voyage.

"It has also been held that a ship is not in navigation when she has been laid up for the winter. And so, one who is engaged in preparing a vessel for winter quarters, by taking apart the engine and packing the pumps and seacocks so that they would not freeze, was not a 'seaman' and could not sue under the Jones Act.

"But a vessel is in navigation, however, when it returns from a voyage and is taken to a drydock to undergo repairs in preparation to making another trip, and likewise a vessel is in navigation, although moored to a dock, if it remains in readiness for another voyage. 1 Norris, *supra* at § 8."

(Author's footnotes omitted.)

■ A vessel which is no longer used for water transportation but has been converted to storage is no longer in navigation. Hawn v. American S.S. Co., 107 F.2d 999 (2d Cir. 1939) (decommissioned ship without motive power used for storage of grain held not to be in navigation). *Cf.* Roper v. United States, 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961) (trial court's conclusion that deactivated liberty ship used for storage of grain was withdrawn from navigation and therefore there was no warrantage of the ship's seaworthiness not clearly erroneous [5]); Kissinger v. United States, 176 F.Supp. 828 (E.D.N.Y.1959) (workmen renovating vessel for use as grain storage ship not entitled to warranty of seaworthiness because vessel withdrawn from navigation). *See generally* Annotation, When Vessel in Navigation for Purposes of Jones Act, 5 A.L.R.Fed. 674, § 12; Annotation, Status of Vessel as in Navigation as Prerequisite of Applicability of Doctrine of Seaworthiness, 7 L.Ed.2d 853, § 4.

III. *Conclusion.*

■ At the time of her arrest the Sonya was being used for storage and generating electricity. The owners had no intention of ever using her again as a means of transportation over the water; in fact, Marine View Fisheries had contracted with the Maritime Administration never to use her in commerce. She was minus her propeller and her main engine was unusable. The duties performed by complainants did not require the skills of a seaman. The ship

---

*used,* as a means of transportation on water."

This broader definition of vessel is generally applied to statutory liens for supplies and repairs under 46 U.S.C.A. § 971 (1958). *See* Pleason v. Gulfport Shipbuilding Corp., 221 F.2d 621 (5th Cir. 1955). *See generally* Annotation, What is a "Vessel" Subject to a Maritime Lien under 46 U.S.C.A. § 971, 3 A.L.R. Fed. 882. The term crew when used in conjunction with the word vessel, however, connotes a vessel still actively plying the seas.

Thus, a vessel may be subject to some maritime liens but not others. For example, repairmen working aboard a vessel temporarily laid up for repairs would not be considered seamen for purposes of the Jones Act, although the policies behind 46 U.S.C.A. § 971 would still be applicable. Although this may create some anomalous situations where the ship has been more or less permanently withdrawn from navigation (*compare* Pleason v. Gulfport Shipbuilding Corp., *supra,* which is indistinguishable from the present case, except that the liens arose under § 971). The definition of a "crewmember" as a "seaman * * * on a vessel in navigation," *The Herdis, supra,* is well established.

5. The court held "The test for determining whether a vessel is in navigation is the 'status of the ship.' * * * This is a question of fact. * * *" 368 U.S. 22–23, 82 S.Ct. 7 (citations omitted). Relevant factors mentioned by the court include the fact that the ship had lost her Coast Guard safety certificate and her license to operate; reactivation for transportation use would require a major overhaul; in short the vessel was not "a self-propelled, self-directed cargo vessel." 368 U.S. at 23, 82 S.Ct. at 7.

Sonya was no longer in navigation and the claimants were not the "crew of the vessel" within the meaning of 46 U.S.C. A. § 953 (1958).

The sums remaining in the Registry pending determination of the validity of the wage claims are hereby ordered to be paid over to the United States as assignee of the first preferred ship mortgage holder.