**KOPAC INTERNATIONAL, INC., a Washington corporation, Plaintiff,**

v.

**M/V BOLD VENTURE, O/N 513392, in rem; TTR Marine Systems Corp., in personam; Bold Venture, in personam, Defendants.**

**SEATTLE–FIRST NATIONAL BANK, Plaintiff,**

v.

**BOLD VENTURE, Off. No. 513392, etc.; et al., Defendants.**

**Tom Adams, et al., Intervening Plaintiff Crewmembers.**

**Emerson GM Diesel, Inc. Intervening Plaintiff.**

**No. C85–1923D.**

United States District Court, W.D. Washington, at Seattle.

May 8, 1986.

Erik Rosenquist, Graham & Dunn, Seattle, Wash., for Kopac Intern.

Dwight Guy, Seattle, Wash., for Seattle-First Nat. Bank.

Henry Haugen, Seattle, Wash., for Tom Adams, Richard A. Hodson, Charlotte J. Emerson, Ernest L. Beitel, John A. Heidt, Soren Lipson, Steven Jungclas.

Craig Watson, Seattle, Wash., for Emerson GM Diesel, Inc.

Gregory E. Keller, Seattle, Wash., for Evergreen Mobile Co.

Gary Furlong, Seattle, Wash., for Sang Hoon Hoh, Kwang C. Keum, Eunho Kim.

John H. Strasburger, Steven P. Connor, Seattle, Wash., for Cassiar Management, Ltd.

Shane Carew, Seattle, Wash., for Harbor Enterprises, Inc.

Harold A. Thoreen, Seattle, Wash., for Charles Honsinger, Joseph Gomes, Steven Garletts, Cathleen Woodson.

John Hagerty, Everett, Wash., for M/V Bold Venture, Bold Venture, Inc.

Paul N. Daigle, Seattle, Wash., for Tor Olsen.

## MEMORANDUM AND SUPPLEMENTAL ORDER

DIMMICK, District Judge.

This case presents a potpourri of maritime claims against a salmon processing vessel, the M/V *Bold Venture*. The *Bold Venture* was arrested after a showing of default on a preferred ship mortgage. On April 25, 1986, after the arrest, numerous motions were made to intervene, for summary judgment of various claims, and for interlocutory sale of the vessel. After hearing oral argument on the pending motions from the *in rem* claimants and considering extensive briefing and research, this Court ordered an interlocutory sale of

the vessel and established lien priority as to a preferred ship mortgagee and a time charterer of the vessel. That lien priority decision is the subject of this Memorandum and Supplemental Order.

As is often the case, the claims against the *Bold Venture* exceed its value. Thus, the liens with priority under the Ship Mortgage Act will be satisfied, while those low in priority will be extinguished by the Marshal's sale and the Court's subsequent distribution of proceeds. Those claimants with low-ranking priorities will be left with only their *in personam* remedies. These *in personam* remedies are circumscribed by the bankruptcy of the shipowners and an automatic stay prohibiting execution of a judgment *in personam* against them for any deficiency.[1] Thus, the only certain recovery for the numerous lien claimants before the Court is from proceeds of the sale of the vessel.

The potpourri of claims include wage claims from three different groups of "crewmembers," wage claims of the nominal master, claims for default of a preferred ship mortgage and for a second unperfected ship mortgage, claims for repairs and bunkers supplied to the vessel, claims to a trailer and to certain fishing equipment allegedly leased to the vessel, and claims that arose during performance of a time charter for tendering and processing salmon aboard the vessel.

The Court and the parties agree that custodial costs, including brokerage fees, have first priority and that adjudicated wage claims have second priority. The question is which claim comes next?

In an attempt to prevail over the preferred ship mortgagee, Seattle-First National Bank ("Sea-First"), the time charterer, Kopac International, Inc. ("Kopac"), has characterized its claims as maritime tort claims. As Gilmore and Black observe, in

---

1. The time charterer has moved for a default judgment *in personam* against the shipowners. Even if the charterer's documentary support for this motion had been admissible as evidence, this Court would not grant this because by Order of October 30, 1985, the bankruptcy court granted relief from stay only as to the vessel. No *in personam* judgment will therefore be entered.

cases involving the negligent performance of a contractual duty, lienors attempt to plead themselves in to the higher priority for tort liens. *The Law of Admiralty* 739–40 (1975).

## I.

### LAW OF MARITIME LIEN PRIORITIES

Under the Ship Mortgage Act, only maritime liens prior in time or maritime liens that are preferred, such as tort liens for collision and personal injury, outrank preferred ship mortgages. 46 U.S.C. § 953(a) (1985). There is no statutory directive and scant case authority [2] on the question of which claims other than those for collision and personal injury may be characterized as tort claims for purposes of 46 U.S.C. § 953(a)(2). Ordinarily, the maritime lien that arises when a vessel owner has breached its contract with a charterer has the relatively low priority of a contract lien. *See, e.g., Cardinal Shipping Corp. v. M/S Seisho Maru,* 744 F.2d 461, 466–67 (5th Cir.1984).

The United States Supreme Court's "one relatively modern decision on lien priorities" is *The John G. Stevens,* decided in 1898. G. Gilmore & C. Black, *The Law of Admiralty* at 740. *The John G. Stevens,* 170 U.S. 113, 18 S.Ct. 544, 42 L.Ed. 969 (1898). In *The John G. Stevens,* negligent towage resulted in a collision. The Court treated the claim like a tort claim for collision and gave it priority over claims for supplies provided to the vessel prior to the collision. The rather limited holding in that case is not helpful here, however. Not only was there a traditional maritime tort involved, namely collision, but the case precedes by several decades the Ship Mortgage Act.

Since the passage of the Ship Mortgage Act, the United States Supreme Court has provided some guidance to the lower courts on setting priorities in the obscure terrain between contract and tort. In *The Thomas Barlum,* the Court emphasized the purpose of the Ship Mortgage Act: to foster the merchant marine by making ship mortgages safe and attractive to investors. *Detroit Trust Co. v. The Thomas Barlum,* 293 U.S. 21, 38–39, 55 S.Ct. 31, 36, 79 L.Ed. 176 (1934). The Court observed that the legislative history of the Act reflects a congressional effort to make mortgages "good except as to certain demands that should be superior to everything else, such as wages." *Id.* at 39, 55 S.Ct. at 36. In holding that loan proceeds from a preferred ship mortgage need not be used by the mortgagor for maritime purposes, the Court reasoned that the fundamental purpose of the Act of protecting investors would have been frustrated if such investors had to discover at their peril the application of the proceeds of the secured loans. *Id.* at 40, 55 S.Ct. at 37. By analogy, the Act's purpose would be frustrated in the present case if investors had to make certain at their peril that the shipowners and ships that they invest in perform their contractual duties.

Further support for a restrictive interpretation of "tort" under 46 U.S.C. § 953(a)(2) may be found in another United States Supreme Court case, *Osaka Shosen Kaisha v. Pacific Export Lumber Co.,* 260 U.S. 490, 497, 43 S.Ct. 172, 173, 67 L.Ed. 364 (1923). The *Osaka* Court explained that because the maritime lien operates secretly to the prejudice of general creditors and purchasers without notice, that lien is "stricti juris." *Id.*

The *Osaka* Court then ruled that "[w]here there is a charter-party, its co-

---

**2.** Kopac mistakenly relies on cases involving breach of a common carrier's duty. *Oriente Commercial, Inc. v. M/V Floridian,* 529 F.2d 221 (4th Cir.1975) (breach of carrier's common-law or statutory duty under COGSA); *The Pacific Spruce,* 1 F.Supp. 593 (W.D.Wash.1932) (cargo lien against common carrier). These cases are inapposite because the *Bold Venture* was not a common carrier, that is, a common ship carrying cargo for public hire. The duties imposed on carriers by the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.* do not apply to the present case because the *Bold Venture* was not a carrier, under the terms of that Act, of goods to a foreign port.

venants will define the duties imposed on the ship." *Id.* at 498, 43 S.Ct. at 173. In addition to such express duties, the existence of a charter party imposes a duty on the vessel to deliver the cargo at the time and place stipulated in the charter party, without injury or deterioration. *Id.* The Court observed, however, that the lien arising for breach of charter party is so circumscribed that no lien arises at all unless the ship receives the cargo and departs on her voyage according to contract. The charterer has instead his personal action for damages. *Id.* The *Osaka* Court concluded by repeating that admiralty liens are *stricti juris*, and that they cannot be extended argumentatively or by analogy or inference. " 'They must be given by the law itself, and the case must be found described in the law.' " *Id.* at 500, 43 S.Ct. at 174.

■ This Court has found no case "described in the law" that provides a tort lien for the claims made here. In the absence of such definitive authority, this Court is guided by lien priority cases in which a charterer's lien claim has been ranked below a prior preferred ship mortgage. The authority most often cited for this principle comes from the Second Circuit: "A maritime lien for breach of charter has priority over the mortgagee only if it has attached before the mortgage was recorded, 46 U.S.C. § 953." *Rainbow Line, Inc. v. M/V Tequila* 480 F.2d 1024, 1028 (2d Cir.1973). In the present case, the preferred ship mortgage was recorded before any breach of charter could have taken place. The parties do not dispute the chronology of their claims. The Second Circuit observed that a sophisticated ship mortgagee, such as Sea-First, is well able to devise adequate protection for itself against liens prior in time. A mortgagor who fails to disclose to the mortgagee the existence of any maritime liens known to him runs the risk of criminal penalties and civil damages. 46 U.S.C. §§ 924, 941(b), (c). *Id.*

A ship mortgagee is not able to protect itself against secret liens, however, that might arise after execution and perfection of the ship mortgage. Thus, the federal statute gives priority to preferred ship mortgagees over all lienors with certain exceptions. First, those with liens prior in time to the mortgage will be prior in right; the mortgagee can discover prior liens and insist on discharge or assume liability for them. Second, liens arising for wages, for salvage, for tort, and for general average are given priority over preferred ship mortgages, generally because these liens must be favored to ensure that the vessel is kept moving in trade. *See generally* G. Varian, *Rank and Priority of Maritime Liens*, 47 Tul.L.Rev. 751 (1973). The priority given to lienors for wages, for salvage, and for general average serves indirectly to protect the mortgagee's interests because the mortgagee wants the vessel to operate. Accordingly, the wages due to seamen are specially protected and ranked above those of the mortgagee. If general average or salvage are necessary, then the mortgagee is served because general average or salvage expenses are incurred for the joint benefit of ship and cargo. *Id.*

Tort liens, on the other hand, do not serve the interests of the mortgagees in any clear way; they are the "loose cannons on the deck." These liens should arise only for those claims that "should be superior to everything else, such as wages." *The Thomas Barlum*, 293 U.S. at 39, 55 S.Ct. at 36. The traditional maritime tort risks of collision and personal injury are insured against, usually by the shipowner. This insurance protects the mortgagee. Insurance mechanisms for protecting maritime investors against the business losses of the mortgaged vessel would be costly and complex. Without such insurance, the mortgagee would sit in an impossible position: On the one hand, the mortgagee wants the vessel in commerce—to make money. On the other hand, the mortgagee will be at risk whenever the vessel is engaged in commerce—because any commercial undertaking could result in claims of "conversion," "business compulsion," or "negligence." Such claims will frequently exceed the value of the vessel, as in the present case. If such claims may be

brought against the vessel with the priority of torts under the Ship Mortgage Act, then investors will be seriously deterred from financing maritime commerce by taking preferred ship mortgages.

The *Rainbow Line* Court's concern for protecting investors in the shipping industry is reflected in several Ninth Circuit opinions. *See Seattle-First Nat'l Bank v. Bluewater Partnership*, 772 F.2d 565, 569 (9th Cir.1985). In an earlier case, the Ninth Circuit reached a conclusion paralleling *Rainbow Line*. *Putnam & Overman v. Lower, Kadlec*, 1956 AMC 2059 (9th Cir.1956). In *Putnam*, the parties had a "Working Share and Contract" to charter a tuna clipper. The venture proved unprofitable. The Ninth Circuit held that various alleged breaches of the contract were not prior in rank to a preferred ship mortgage. *Id.* at 2076.

## II.

### ANALYSIS OF TIME CHARTERER'S CLAIMS

Among the scarce authorities available, the most pertinent here is *Osaka Shosen Kaisha v. Pacific Export Lumber Co.*, 260 U.S. 490, 497–98, 43 S.Ct. 172, 173, 67 L.Ed. 364 (1923). Applying the *Osaka* Court's analysis to the present facts, the question becomes: Do the charterer's claims against the *Bold Venture* fall within the scope of the covenants of the charter party? More precisely, do the charterer's factual allegations arise from purposeful activity in the course of performing under the charter party? If so, those claims sound in contract.

### A. Factual Allegations of Time Charterer

■ The time charterer, Kopac, alleges (1) loss of salmon, (2) involuntary removal of the one of its representatives from the vessel, (3) overpayment of charter hire, and (4) late arrival to and early departure from fishing grounds as well as certain equipment problems. Assuming for purposes of summary judgment the truth of these fac-

tual allegations, the question is whether these were purposeful acts done in performance of the charter party?

### (1) Loss of Salmon

The charter party is for tendering and processing salmon. The *Bold Venture* agreed to take delivery of salmon from tendering boats under charter to Kopac in Bristol Bay. Kopac agreed to deliver to the *Bold Venture* certain quantities of salmon during the contract period, as set forth in the charter party. Payment, loading and unloading are described in the agreement. The risk of loss or damage to cargo product was allocated to Kopac; Kopac agreed to purchase at its sole expense cargo insurance coverage with full waiver of subrogation against the vessel and owner and agreed to hold the vessel and its owner harmless for any and all loss or damage to the cargo product. In the course of performance, some salmon were not accounted for to Kopac's satisfaction. Assuming the alleged loss occurred, it was expressly provided for in the contract and would thereby constitute breach of the charter party. In short, Kopac's cargo rights spring *ex contractu*. Kopac may thus claim a contract lien against the vessel for this loss, if the loss is proven.

### (2) Involuntary Removal of Charterer's Representative

Under the charter party, the owner agrees to provide free room and board for up to four representatives of Kopac during the contract term. At the conclusion of the processing activity, one of Kopac's representatives was asked to leave the vessel. When he refused, the captain asked the local authorities to remove him, which was peaceably done. Unless the contract term was in fact over, the vessel's refusal to continue to provide food and lodging would constitute breach of the charter party. Under the circumstances, the captain's only possible means of refusing food and lodging was to compel the representative to disembark; while on board, the representative would obviously require shelter and

sustenance. As relief, Kopac prays for reimbursement of out-of-pocket expenses of the representative while in Dutch Harbor (where he left the vessel) and for his air fare out of Dutch Harbor. These damages would logically arise from breach of contractual duties as described in the charter party. Thus, Kopac may claim a contract lien against the vessel for these costs, if a breach is proven.

### (3) Overpayment of Charter Hire

Kopac alleges that it was induced to pay more than it owed under the charter party. This claim is based on Kopac's interpretation of payment terms in the charter party. Even without Kopac's explicit reliance on the terms of the contract itself, payment of charter hire would unquestionably fall within the scope of the parties' contractual duties.

### (4) Timing of Arrival and Departure

Kopac alleges late arrival, due to time taken for repairs en route, and early departure from the fishing grounds, resulting in loss of profits. The charter party provides that the vessel will begin processing "on or about" June 20, 1985, and would continue until "on or about" August 20, 1985. Whether or not the actual arrival and departure times constitute breach of the charter party are questions of contract, not tort, law. Whether the damages claimed by Kopac for the delay and early departure are recoverable are similarly issues of contract law.

Kopac alleges that delays and the need for repair constitute unseaworthiness. Even if the vessel were found to be unseaworthy in certain ways, unless the unseaworthiness went to the root of the contract, the charterers were obliged to continue the charter, as they voluntarily did, and to seek their remedies in damages. *See generally* M. Wilford & T. Coghlin, et al., *Time Charters* (2d ed. 1982); *Aaby v. States Marine Corp.*, 181 F.2d 383, 1950 AMC 947 (2d Cir.), *cert. denied*, 340 U.S. 829, 71 S.Ct. 66, 95 L.Ed. 609 (1950); *Petroleum Export Corp. v. Kerr S.S. Co.*, 32 F.2d 969, 1929

AMC 905 (9th Cir.1929). This is evidently what they are here attempting to do.

■ To the extent that Kopac claims loss of profits, its claim is disallowed as too uncertain. *Putnam & Overman v. Lower, Kadlec*, 1956 AMC 2059, 2073 (9th Cir. 1956) (prospective fishing profits are too speculative to be a proper measure of damages). *See also Interocean Shipping Co. v. M/V Lygaria*, 1981 AMC 2244 (D.Md. 1981). Kopac may, however, attempt to prove its contract lien claims for breaches resulting in measurable damages. *See, e.g., The Schooner Freeman v. Buckingham*, 18 How. 182, 190, 59 U.S. 182, 190, 15 L.Ed. 341 (1856) (charter parties give rise to lien on vessel); *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024 (2d Cir.1973); *The Oceano*, 148 F. 131, 133 (S.D.N.Y. 1906).

### B. Summary

To grant tort status here would seriously undermine the purpose of the Ship Mortgage Act itself. It was designed to stimulate private investment in shipping by offering greater protection to investors. As the Ninth Circuit has recently observed, "Before the Act's passage, it was impossible to foreclose on a ship mortgage in admiralty.... 'This inferior status provided the mortgage holder with little security, a fact which adversely affected investor interest.'" *Seattle-First National Bank v. Bluewater Partnership*, 772 F.2d 565, 569 (9th Cir.1985); *Merchants Nat'l Bank of Mobile v. The Ward Rig No. 7*, 634 F.2d 952, 955 (5th Cir.1981), 1981 AMC 1930, 1933 (aim of Ship Mortgage Act is to stimulate private investment by offering greater protection to investors); *accord, Peninsula Savings & Loan Association v. O/S Seismic Sea*, 1984 AMC 2635, 2640 (D.C.Or. 1984). The solution to the tort-contract dilemma in the area of commercial enterprises should be to look to the basis of the relationship between the parties. If the parties are contractually bound, the strong presumption should be that any damages claimed will be contractual. If the parties have no commercial relationship, for exam-

ple, if a vessel collides with a pleasure craft, then the appropriate characterization is that of tort. This analysis accords with the general policies governing the maritime lien, as explained by the United States Supreme Court. The maritime "lien, though adhering to the vessel, is a secret one; it may operate to the prejudice of general creditors and purchasers without notice; it is therefore 'stricti juris,' and cannot be extended by construction, analogy, or inference." *Osaka Shosen Kaisha v. Pacific Export Lumber Co.*, 260 U.S. 490, 497, 43 S.Ct. 172, 173, 67 L.Ed. 364 (1923).

### III.

### CONCLUSION

This Court holds that a time charterer of a domestic fish processing vessel has contract liens for purposeful activities of the vessel in breach of the terms of the charter party.

The lien of the preferred ship mortgagee, Sea-First, will therefore be satisfied after custodial costs, including broker's fees,[3] and wage liens.[4] The costs and wages will be paid first from the proceeds. The preferred ship mortgage claim will be satisfied from the balance. If the proceeds exceed the value of the administrative costs, wages, and the preferred ship mortgage, then the remaining proceeds will be shared pro rata between the two maritime lien claimants who supplied bunkers and repairs to the vessel during July and August of 1985. *The St. Paul*, 277 F. 99, 109 (S.D.N.Y.1921) (cargo claimant is subordinate to supply and repair lienors).[5] Because the value of the vessel as described in affidavits of expert appraisers is inadequate to satisfy costs, wages, and the preferred mortgage, it is unlikely that suppliers will receive any share of the proceeds. Because this Court ranks Kopac's contract claims below those of the suppliers, it is highly unlikely that Kopac's *in rem* claims will be satisfied, even in part. Thus, the Court finds no just reason for delay in entering final judgment as to the priority of Kopac's lien against the *Bold Venture*.

The Clerk of the Court is hereby instructed to enter as a final judgment foreclosure of Sea-First's preferred ship mortgage dated May 29, 1985, on the vessel *Bold Venture* and Kopac's lien priority as set forth in this Supplemental Order, and the Order of Partial Summary Judgment of April 25, 1986. The Clerk is further instructed to send copies of this Memorandum and Supplemental Order to all counsel of record.

3. This Court authorized the United States Marshal to retain the services of a reputable ship broker to advertise the sale in appropriate trade circles, to show the vessel, and to inform potential bidders about her, the object being to realize a fair market price. *See, e.g., Morgan Guarantee Trust Co. of New York v. M/V Hellenic Sun*, 1985 AMC 437 (D.C.Md.1985) and 1985 AMC 442, 581 F.Supp. 1266 (D.C.Md.1985). The Marshal is to pay a set percentage of the sale price to the broker as an administrative cost; in addition, the Marshal's statutory fees will be paid as set forth in 28 U.S.C. § 1921.

4. This Court has adjudicated 15 of the wage claims already, using the test set forth in M. Norris, *The Law of Seamen* §§ 2:11–12 (4th ed. 1985); *see New England Fish Co. v. Barge Sonya*, 332 F.Supp. 463 (D.Alaska 1971) (adopting Norris test); *The Herdis*, 22 F.2d 304, 306 (D.Md. 1927). The test customarily used for wage claims is: (a) Is the vessel in navigation? (b) Are the services maritime in character? (c) Is the claimant aboard primarily to aid in navigation? The remaining wage claims will be adjudicated according to this test.

5. The court in *The St. Paul*, 277 Fed. 99, 109 (S.D.N.Y.1921) stated:
   The freights justify the venture and the voyage, but the cargo owner can protect himself by insurance, and safeguard his shipment in a way not open to the supply or repair men. If it were to be held, as matter of law, that the lien of cargo was always superior to that of the furnishers of supplies and the makers of repairs, great difficulty might be found in obtaining supplies and having repairs done; for, as is seen in this case, the cargo liens naturally would be so large, that they might wipe out or seriously impair the lien for repairs and supplies, and the repair and supply men might well hesitate or decline to extend credit on the faith of the ship.