IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 00-31288

---

BANK ONE LOUISIANA N A,

Plaintiff-Appellee,

versus

MR DEAN MV, Etc.; ET AL,

Defendants,

BARGECARIB INCORPORATED,

Intervenor-Appellant.

---

Appeals from the United States District Court
for the Eastern District of Louisiana

---

June 10, 2002

Before GARWOOD and WIENER, Circuit Judges and FALLON, District Judge.[1]

GARWOOD, Circuit Judge:

BargeCarib, Inc. (BargeCarib) appeals the district court's grant of summary judgment in favor of Bank One, Louisiana N.A. (Bank One) establishing that Bank One's preferred ship mortgage had priority over BargeCarib's maritime lien for breach of charter. Because maritime liens for breach of charter attach at the moment

---

[1]District Judge of the Eastern District of Louisiana, sitting by designation.

the owner places the vessel at the charterer's disposal, we vacate and remand.

## Background

BargeCarib, Inc. (a subsidiary of American Rice, Inc.) sells rice to Haiti and transports it there by an oceangoing barge called the LauriKristi. To provide propulsion for the LauriKristi, BargeCarib executed a time charter agreement with Offshore Supply Ships, Inc. (Offshore), owner of the towboat M/V Sovereign, to hire the Sovereign for a period of one year, beginning August 15, 1996. BargeCarib began using the Sovereign under this charter and later, in July 1997, timely exercised its contractual right, provided for in the charter, to extend the charter for another year.

On May 20, 1997, Offshore sold the Sovereign to Global Towing, LLC (Global). To finance this purchase, Global received a line of credit from First National Bank of Commerce (FNBC) and in return gave FNBC a $2,000,000 preferred ship mortgage as security. Global completely satisfied the Sovereign's existing mortgage of record and FNBC duly recorded its preferred mortgage on May 21, 1997. On October 2, 1998, Global's owner Michael Blake executed an $800,000 guarantee of the Global indebtedness.

After the sale of the vessel and recording of the mortgage, Offshore and Global reassured BargeCarib that the Sovereign, now renamed the M/V Mr. Dean, would sail on time for a scheduled trip to Haiti. Nevertheless, Global delivered neither the Mr. Dean nor

2

a substitute suitable under the charter. BargeCarib immediately filed suit in the United States District Court for the Southern District of Texas against the Mr. Dean *in rem* and Global *in personam* for breach of the charter. This court held that the charter had indeed been breached. *BargeCarib Inc. v. Offshore Supply Ships, Inc.*, 168 F.3d 227 (5th Cir. 1999). On remand, the district court held that the date of breach was July 10, 1997.

Global defaulted on the loan and Blake refused to pay under the terms of his guarantee. On March 24, 2000, Bank One (successor by merger to FNBC) responded by filing the present lawsuit in the United States District Court for the Eastern District of Louisiana against the Mr. Dean *in rem* and against Global and Blake *in personam*. On June 2, 2000, BargeCarib intervened in the lawsuit and asserted a maritime lien based on the breach of charter. BargeCarib and Bank One disputed the priorities of their claims to the Mr. Dean, a critical issue because the proceeds of sale of the Mr. Dean would be unlikely to satisfy both interests. They filed cross motions for summary judgment, and by order dated September 29, 2000 and entered October 2, 2000, the district court denied BargeCarib's motion and granted summary judgment to Bank One, determining that Bank One's mortgage had priority over BargeCarib's maritime lien. BargeCarib has timely appealed the September 29 order.

**Discussion**

3

*I. Threshold Issues*

This court takes jurisdiction of this appeal pursuant to 28 U.S.C. § 1292(a)(3), allowing for review of interlocutory decrees of district courts determining the rights and liabilities of the parties to admiralty cases. Because the grant of summary judgment disposed of BargeCarib's case on the merits, we have jurisdiction even without Rule 54(b) certification. *See Walter E. Heller and Co. v. O/S Sonny V.*, 595 F.2d 968, 971-72 (5th Cir. 1979). We review a grant of summary judgment "*de novo*, applying the same standards as the district court, while viewing all disputed facts and reasonable inferences in the light most favorable to the nonmoving party." *McClendon v. City of Columbia*, 258 F.3d 432, 435 (5th Cir. 2001) (quotation omitted).

*II. Attachment of a Maritime Lien*

Under the Ship Mortgage Act, Bank One's mortgage takes priority over all other claims against the vessel except for "preferred maritime liens." 46 U.S.C. § 31326(b)(1). Under the facts of this case, BargeCarib's lien could only be preferred if it "arose" before the mortgage was filed. 46 U.S.C. § 31301(5)(A). The time charter commenced before the mortgage was filed, but Offshore and Global breached the charter twenty days after that date. Thus, this case presents the purely legal question of when a maritime lien for breach of charter "arises." Bank One prevails if maritime liens arise at the time of breach, while BargeCarib

4

prevails if they arise at the inception of the charter.

We begin our analysis, as we must, with a recognition of the unique qualities of the maritime lien. Rather than arising from the English common law, maritime liens are based on principles of civil law. *The Young Mechanic*, 30 F. Cas. 873, 874 (Curtis, Circuit Justice 1855). As a result, a "maritime lien, so-called, is not a lien at all in the common-law sense of the term." GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY 586 (2nd ed. 1975) (hereinafter GILMORE & BLACK). "A lien is a lien is a lien, but a maritime lien is not." *Id*. at 589. This case concerns the maritime lien's unique power to confer the right to sue the vessel itself *in rem*, almost as if it were a person. *See id*. at 589.[2] When the vessel is sold under an *in rem* proceeding to satisfy a maritime lien, the owner takes the vessel free of all liens imposed anywhere in the world. *Id*. at 622. Accordingly, we take note that our analysis should not be primarily guided by reference to the commercial law of secured credit or the land-based common law of liens. Instead, we find our guidance in the ancient and peculiar case law of admiralty. While recent cases cast only a dim glow, we

---

[2] "[T]he ship, personified, is itself—or herself—the defendant in a proceeding *in rem* to enforce a lien. The ship is "the offending thing"; the lien itself is, in an obscure Latin jingle which has been so often repeated that it is no longer polite to inquire what it means, *jus in re* rather than *jus ad rem*." GILMORE & BLACK at 589. Yet, "[i]t may be concluded that the fiction of ship's personality has never been much more than a literary theme." *Id*. at 616.

5

find our lighthouse in the Supreme Court of the 1860s.

*A.  Older Case Law*

A wealth of authority from the nineteenth century exists to guide us in our resolution of this case.  We discover that courts have long understood that maritime liens for charters and shipping contracts attach at the beginning of the contract and remain inchoate until breached.

The Supreme Court first examined the timing of charter liens in *The Freeman*, 59 U.S. (18 How.) 182 (1855), observing in *dictum* that "charterparties, must, in the invariable regular course of that business, be made, for the performance of which the law confers a lien on the vessel."  *Id*. at 190.  The Court added that "third persons, who have shipped merchandise and taken bills of lading therefor, would thereby acquire a lien on the vessel."  *Id*. This use of "thereby" implies that the lien attaches at the delivery of the merchandise, a point made explicit in 1860 when Mr. Justice Nelson held that:

> "The goods were put on board of the vessel, and, if the lien attached at all, it attached as soon as they were laden on board.  So far as the form of the remedy is concerned, it is the same as if the voyage had been broken up by the charterers at any other point in the course of the voyage, after the vessel had been out a week, a month, or longer."  *The Hermitage*, 12 F. Cas. 27, 28 (Nelson, Circuit Justice 1860).

The entire Court agreed that same term, holding that "we do not see why the lien may not attach, when the cargo is delivered to the master for shipment."  *The Edwin*, 65 U.S. (24 How.) 386, 394

6

(1860).  The Court reaffirmed the principle six years later. "[T]he better opinion is, that the lien for freight commences as soon as the goods are delivered into the control of the master, or certainly as soon as they are put on board."  *The Bird of Paradise*, 72 U.S. (5 Wall.) 545, 563 (1866).[3]  These holdings were reiterated by district and circuit courts.  "[A]s soon as the performance of the contract is commenced a lien exists on the vessel in favor of the shipper or charterer, and a suit *in rem* may be maintained against the same for any liability of the master or owner arising on or growing out of such contract."  *The Director*, 26 F. 708, 710 (D. Or. 1886).  *See also The Oceano*, 148 F. 131, 133 (S.D.N.Y. 1906) (quoting same); *The Esrom*, 272 F. 266, 270-71 (2nd Cir. 1921) ("[T]he lien of the vessel upon the goods and of the goods upon the vessel attaches from the moment the goods are laden on board").

Soon after *The Bird of Paradise*, the Supreme Court elaborated further by adopting the Privy Council's classic exposition of the maritime lien:

> "A maritime lien is the foundation of the proceeding *in rem*, a process *to make perfect a right inchoate from the moment the lien attaches*; and whilst it must be admitted

---

[3]  This reasoning was carried forward in *Osaka Shosen Kaisha v. Pacific Export Lumber Co. (The Saigon Maru)*, 43 S.Ct. 172 (1923), which held that "[t]he contract of affreightment itself creates no lien, and this court has consistently declared that the obligation between ship and cargo is mutual and reciprocal and does not attach until the cargo is on board or in the master's custody." *Id*. at 174.  *See also Krauss Bros. Lumber Co. v. Dimon S.S. Corp.*, 54 S.Ct. 105, 106 (1933).

7

that where such lien exists, a proceeding *in rem* may be had, it will be found to be equally true, that in all cases where a proceeding *in rem* is the proper course, there a maritime lien exists, which gives a privilege or claim upon the thing, to be carried into effect by legal process." *The Bold Buccleugh*, 7 Eng. Rep. 267, 284 (1851), *quoted in The Rock Island Bridge*, 73 U.S. (6 Wall.) 213, 215 (1867) (emphasis added).

This statement explains how a maritime lien can attach at the beginning of the charter, yet only be enforceable at the time of breach: the lien remains "inchoate" until "perfected." The lien exists from the beginning of the charter to provide security for the parties:

"Shipowners contract for the safe custody, due transport, and right delivery of the cargo, and for the performance of their contract the ship, her apparel and furniture, are pledged in each particular case, and the shipper, consignee, or owner of the cargo, contracts to pay the freight and charges, and to the fulfillment of their contract the cargo is pledged to the ship, and those obligations are reciprocal, and the maritime law creates reciprocal liens for their enforcement." *The Maggie Hammond*, 76 U.S. (9 Wall.) 435, 450 (1869).

Judge Hough later clarified the true purpose of the rule:

"The ancient and customary lien of the sea is not maintained, nor was it created (so far as history reveals its origin) for the convenience or assurance of parties, but for the encouragement of commerce and shipping as a presumed benefit to the public, in respect of an occupation hazardous and uncertain beyond most land ventures." *The Saturnus*, 250 F. 407, 414 (2nd Cir. 1918).

Even though the lien attaches at the beginning of the venture, the inchoate lien cannot permit suit against the vessel *in rem* until "perfected" by a breach of the charter. This principle was best stated in 1921:

> "From the moment, therefore, that the cargo was aboard the St. Paul, the lien attached. It is argued, however, that this lien was 'inchoate,' in the meaning of not being perfected . . . . It is 'inchoate' only in the sense of enforceability. In other words, the lien is discharged, ipso facto, when the ship performs its duty to the cargo. If it does not, then the enforcement 'relates back to the period when it first attached'; for the lien is born and exists, until discharged, from the moment the cargo is aboard." *The St. Paul*, 277 F. 99, 106 (S.D.N.Y. 1921).

Thus, the maritime lien attaches at the commencement of the undertaking and any subsequent breach perfecting the lien relates back to that time. BargeCarib's maritime lien arose when the Mr. Dean (then called the Sovereign) was delivered under the time charter agreement, and it was perfected when Global and Offshore breached the contract.

B. *The Executory Contract Doctrine*

The above cases require that the cargo be aboard the vessel in order for the lien to attach. This comes from the "executory contract doctrine," the principle that a maritime lien does not attach if the contract has not, by the actual loading of cargo, ceased to be wholly executory. Though it can be seen in earlier cases, the Court stated the rule clearly in 1870:

> "[T]he law creates no lien on a vessel as a security for the performance of a contract to transport a cargo until some lawful contract of affreightment is made, and the cargo to which it relates has been delivered to the custody of the master or some one authorized to receive it." *The Keokuk*, 76 U.S. (9 Wall.) 517 (1870).

Bank One characterizes the executory contract doctrine as an exception to the general rule that breach of contract gives rise to

9

a maritime lien, not as an indication of when the lien attaches. Thomas Schoenbaum intimates the same in his treatise *Admiralty and Maritime Law*. See 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 9-2, at 506-07 (3rd ed. 2001).

We choose instead to rely upon the above case law and on other treatises. *See* 2 BENEDICT ON ADMIRALTY § 43, at 3-48 (7th ed. rev. 1988); MICHAEL WILFORD ET AL., TIME CHARTERS 498 (4th ed. 1995). The executory contract doctrine encompasses the earlier case law and merely restates the fact that an inchoate maritime lien attaches once the cargo is loaded. This is the meaning of our more recent statement that "under the 'executory contract doctrine,' a maritime lien for breach of charterparty arises once (and to the extent that) cargo is loaded on board." *Cardinal Shipping Corp. v. M/V Seisho Maru*, 744 F.2d 461, 467 (5th Cir. 1984).

We must also note the application of this doctrine to the present case. The asserted maritime lien arises from a time charter and not a contract of affreightment, a distinction we made in *E.A.S.T., Inc. of Stamford, Connecticut v. M/V Alaia*, 876 F.2d 1168 (5th Cir. 1989). "A time charterer does not pay freight to the vessel owner for the safe transport of a specific cargo to a specific destination, but pays instead for the use of the vessel for a specified period of time—the intended use of the vessel may not include the transportation of any cargo at all or may be to make a series of voyages, carrying different cargo to various

10

destinations." *Id.* at 1176. For that reason, even though a contract for affreightment ceases to be executory only when the cargo is loaded, "the vessel begins performance of the [time charter] contract when it 'is placed at the charterer's disposal'" and ceases to be executory at that point. *Id.* at 1176. Under the logic we expressed in *Alaia*, then, a maritime lien for breach of a time charter attaches when the owner places the vessel at the charterer's disposal. In the present case, the vessel had already been delivered to BargeCarib and BargeCarib had made several voyages with it.[4] BargeCarib's maritime lien thus arose before the preferred ship mortgage was recorded.

*C. Recent Case Law*

Very few recent cases even hint at when a maritime lien arises.[5] The Supreme Court has not discussed the priority of maritime liens since 1898, no recent circuit court case addresses the issue before us, and district courts have addressed the issue

---

[4] We acknowledge that *Alaia* only applies to "a breach only of the time charter *qua* time charter and not of a contract of affreightment *evidenced* by a time charter." *Alaia*, 876 F.2d at 1177 (emphasis in original). After reviewing the record, the time charter agreement, the complaint in intervention, and our prior opinion in BargeCarib's claim, nothing appears which suggests that this was merely a contract of affreightment evidenced by a time charter.

[5] "There has been little priority litigation even at the trial court level since, roughly, the 1920's." GILMORE & BLACK at 736. "In a priority case today, the most recent authority on any point will probably be a case decided by a District Judge thirty or forty or fifty years ago." *Id.* at 737.

but split in their results. Though this confusion means we cannot rest upon recent holdings, it also means that nothing has altered the precedent laid down in the last century.

Bank One most heavily relies upon our decision in *Cardinal Shipping Corp. v. M/V Seisho Maru*, 744 F.2d 461 (5th Cir. 1984), quoting our statement that "a maritime lien typically arises when the owner has breached its contract with the charterer." *Id*. at 466. Yet, in *Cardinal Shipping* we were discussing whether a sub-charter confers the right to sue the vessel *in rem* or whether the litigant must be satisfied with the usual *in personam* and *quasi in rem* approaches. *Id*. at 467. Placed within its context, the statement merely addresses the existence of a maritime lien and not when that lien attaches. This reading gains support from our later statement in *Cardinal Shipping* that "under the 'executory contract doctrine,' a maritime lien for breach of charterparty arises once (and to the extent that) cargo is loaded on board." *Id*. "The fanciful courts have envisioned a 'union of ship and cargo' marking the commencement of the lien." *Id*. As we explained above, these later statements delineate the exact point at which the lien attaches and undermine Bank One's interpretation of the earlier sentence. At any rate, *Cardinal Shipping* would not bind us because it addressed a breach at the beginning of the charter. *Id*. at 464. Any statement regarding the timing of the lien would therefore be *dictum*.

12

For the same reason, we find inapposite the Second Circuit's treatment of maritime liens in *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024 (2nd Cir. 1973). The Second Circuit held in *Rainbow Line* that "there is a maritime lien for the breach of a charter party," a holding we followed in *International Marine Towing v. Southern Leasing Partners, Ltd.*, 722 F.2d 126, 130-31 (5th Cir. 1983). Though the *Rainbow Line* court states that "a maritime lien for breach of charter has priority over the mortgagee only if it has attached before the mortgage was recorded," *Rainbow Line*, 480 F.2d at 1028, this only begs the question before us. Moreover, just as in *Cardinal Shipping*, the *Rainbow Line* court was considering a breach of charter that occurred before the mortgage was recorded. Any inference regarding the time of attachment would thus be *dictum*.

Finally, we note that our opinion in *International Marine Towing v. Southern Leasing Partners, Ltd.*, 722 F.2d 126 (5th Cir. 1983) implies in several places that the breach of the charter gives rise to the maritime lien. *See, e.g.*, *id*. at 130 ("III. MARITIME LIENS ARISING FROM BREACH OF THE CHARTER PARTY"); *id*. at 132 (". . . the clause does not speak to the issue of liens created by the owner's breach . . ."). We also note, however, that *International Marine Towing* only discussed the existence of the maritime lien and declined to go any further. *Id*. at 132-33. As with *Rainbow Line* and *Cardinal Shipping*, this court did not have

13

before it the question we consider today. Therefore, while we were apparently under the impression that breach of charter confers a maritime lien at the moment of breach, we don't think our passing *dicta* should lead us to disregard Supreme Court precedent.

Some district courts have, of late, directly ruled on the question presented here. In *Kopac International, Inc. v. M/V Bold Venture*, 638 F. Supp. 87 (W.D. Wash. 1986), the court held[6] that a mortgage took priority over a lien for breach of charter because the mortgage was recorded before any breach could have occurred. *Id*. at 90. The only authority offered by the *Kopac* court was the equivocal quote from *Rainbow Line* discussed above; the district court apparently jumped to conclusions and thus the decision commands little deference. *Id*. In *Rainbow Line, Inc. v. M/V Tequila*, 341 F. Supp. 459 (S.D.N.Y. 1972), a district court determined priority by reference to the date of breach. *Id*. at 464. This reference was not carried forward into the Second Circuit's opinion in the case, probably because (as discussed above) it is not necessary to the decision.

On the other hand, some modern district court opinions support BargeCarib's position. In *Medina v. Marvirazon Compania Naviera, S.A.*, 533 F. Supp. 1279 (D. Mass. 1982), the district court held

---

[6] Appellants attempt to characterize the *Kopac* holding as *dictum*, but we note that the proceeds of the sale were distributed according to the court's holding on priority. *Kopac*, 638 F. Supp. at 93.

14

that "a lien in favor of the charterer attaches to the vessel from the moment performance of a charter commences." *Id*. at 1290. BargeCarib also directs us to two district court cases where ongoing contracts begun before the mortgage were held to have priority over the mortgage. *Redwood Empire Production Credit Association v. Fishing Vessel Owners Marine Ways, Inc.*, 530 F. Supp. 75 (W.D. Wash. 1981); *Caterpillar Financial Services, Inc. v. Aleutian Chalice*, 1994 A.M.C. 1767, 1994 WL 468187 (W.D. Wash. 1994). These cases fall within a line of such holdings, explained by Gilmore and Black:

> "Where repairs, being performed under contract, were begun before, but not completed until after recording and indorsement, it has reasonably been held that the entire repair claim was entitled to priority. The basis of such holdings seems to be that the repair man was under a contractual duty to go forward with the work; a supply man who continued to furnish supplies after the mortgage had been recorded and indorsed would not be entitled to priority." GILMORE & BLACK at 755-56, *citing The Eastern Shore*, 31 F. Supp. 964, 1940 A.M.C. 388 (D. Md. 1940) and *The Transford*, 1929 A.M.C. 727 (E.D.N.Y. 1929).

We agree with BargeCarib that these cases suggest that the relevant date for continuing contracts should be the date of commencement of performance, and that the charter is somewhat analogous.

Nothing in the more modern case law dissuades us from the path charted by the Supreme Court 140 years ago.

*D. Other Language in Recent Case Law*

Some recent statements in *dictum* are even more ambiguous as to the present question, but should nevertheless be examined in light

15

of the rule we have discovered.  We first note our passing observation that "the [maritime] lien arises when the debt arises." *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986) (en banc).[7]  This court took as its authority *The Poznan*, 9 F.2d 838, 842 (2nd Cir. 1925), *rev'd on other grounds,* 47 S.Ct. 482 (1927).  *Equilease*, 793 F.2d at 602.  The true meaning of the quoted language can be more clearly seen in *The Poznan*, which states the rule as follows:

> "[The maritime lien] is given by the law, and it gives the creditor a special property in the ship, which subsists from the moment the debt arises, and it gives him a right to have the ship sold that his debt may be paid out of the proceeds of the sale."  *The Poznan*, 9 F.3d at 842.

This was the original statement of the rule, before the language was modernized.  *See The Young Mechanic*, 30 F. Cas. 873, 875 (Curtis, Circuit Justice 1855) ("the law creating an incumbrance thereon, and vesting in the creditor, . . . which subsists from the moment when the debt or claim arises"); *The J.E. Rumbell*, 13 S.Ct. 498, 499 (1893) (quoting same); 2 BENEDICT ON ADMIRALTY § 22 (7th ed. rev. 1988).  The word "subsists" becomes essential here, because it does not mean "springs into being" but rather "exists" in the sense of "persists" or "continues."  *See Webster's Third New*

---

[7]  This language was quoted in *Governor and Co. of Bank of Scotland v. Sabay*, 211 F.3d 261, 268 (5th Cir. 2000).  The district court also makes a similar statement in *European-American Banking Corp. v. M/S Rosaria*, 486 F. Supp. 245, 255 (S.D. Miss. 1978).

*International Dictionary Unabridged* 2279 (1961). The maritime lien attaches when the cargo is loaded or the chartered vessel delivered, and continues when the debt perfects (or "vests") the power to later sue the vessel *in rem*. The Second Circuit in *The Poznan* must have agreed, or they would not have observed that "the lien . . . attaches from the moment the goods are laden on board." *The Poznan*, 9 F.2d at 842, *quoting The Esrom*, 272 F.2d 266, 270 (2nd Cir. 1921). We are therefore not troubled by this statement in our recent case law. When the debt arises, what "arises" is not the lien itself but rather the right to sue *in rem*.

We have also previously stated that "because the damages sought to be recovered by [the charterer] . . . flow directly from the breach of the charter, it has a maritime lien." *International Marine Towing v. Southern Leasing Partners*, 722 F.2d 126, 131 (5th Cir. 1983), *quoting Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024, 1027 (2nd Cir. 1973) (alterations in original). Given the Supreme Court precedent on point, we take this statement to mean only that once the lawsuit is filed, maritime lien status only extends to those damages which flow directly from the breach of charter. Insofar as the statement might imply the timing of maritime liens, it would be *dictum* anyway.

E.  *The Ship Mortgage Act*

Finally, the parties rely upon the Ship Mortgage Act, now codified at 46 U.S.C. § 31301 *et seq*. While the statute has

17

nothing explicit to say on the issue before us, Bank One argues that the lender protections of the statute would be undermined if maritime liens for breach of charter attached at the beginning of performance of the contract, in that the lender would be subordinated for a longer period of time. While that is likely the case, we do not agree that this "problem" compels us to accept Bank One's proposed rule. We also note that a lender may have a difficult time knowing whether an ongoing charter has been breached, while a rule establishing an inchoate maritime lien at the beginning of the charter results in greater certainty. Such certainty assists the parties with the reporting requirements of 46 U.S.C. § 31323 and with their own investigations.[8] The parties therefore advance two different readings of law, each of which may demonstrate a Congressional purpose. Because of this equivocation, we cannot find guidance in either. Instead, we choose to follow the precedent begun by the Supreme Court in the 1860s and carried forward into this century by the circuit and district courts.

### Conclusion

Courts in the nineteenth and early twentieth centuries held that a maritime lien attaches when a charter ceases to be executory and remains inchoate until perfected by the breach of that charter;

---

[8] We note that the lender has no responsibility to search for obligations beyond those reported by the shipowner under the duty established in 46 U.S.C. § 31323. *Pascagoula Dock Station v. Merchants and Marine Bank*, 271 F.2d 53 (5th Cir. 1959).

18

we see nothing in the ambiguities of recent case law that undermines that authority. This principle can be refined by observing that unlike a contract of affreightment, a time charter ceases to be executory when the owner places the vessel at the charterer's disposal. A maritime lien for breach of a charter thus attaches when the owner places the vessel at the charterer's disposal and remains inchoate until perfected by a breach or discharged by the undisturbed end of the charter.

In the present case, the vessel had been placed at BargeCarib's disposal, and was employed under the charter, months before Bank One recorded its preferred ship mortgage, and therefore an inchoate maritime lien attached to the Mr. Dean. When Global and Offshore perfected BargeCarib's maritime lien by breaching the charter, the lien became enforceable. Nevertheless, the maritime lien "arose" before the mortgage was filed. For this reason, the district court improperly granted Bank One's motion for summary judgment and improperly denied BargeCarib's motion for summary judgment. Accordingly, we VACATE the decisions of the district court and REMAND for further proceedings not inconsistent with this opinion.

VACATED AND REMANDED